## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JANE DOE,**

       Plaintiff,

v.

**CASE NO._____**

**UNIVERSAL HEALTH SERVICES, INC.**
367 S. Gulph Rd.
King of Prussia, PA 19406

**JURY TRIAL DEMANDED**

<u>Serve</u>:
Corporation Service Company
251 Little Falls Dr.
Wilmington, DE 19808

and

**UHS OF D.C., INC.**
367 S. Gulph Rd.
King of Prussia, PA 19406

<u>Serve</u>:
Corporation Service Company
1090 Vermont Ave., NW
Washington, DC 20005

and

**UHS OF DELAWARE, INC.**
367 S. Gulph Rd.
King of Prussia, PA 19406

<u>Serve</u>:
Corporation Service Company
1090 Vermont Ave., NW
Washington, DC 20005

and

**WISCONSIN AVENUE PSYCHIATRIC
CENTER, INC. d/b/a PSYCHIATRIC
INSTITUTE OF WASHINGTON**
4228 Wisconsin Avenue, NW

Washington, DC 20016

<u>Serve</u>:
Corporation Service Company
1090 Vermont Ave., NW
Washington, DC 20005

       Defendants.

## **CLASS ACTION COMPLAINT AND JURY DEMAND**

COMES NOW, the Plaintiff, Jane Doe, individually and on behalf of a class of persons similarly situated, by and through the undersigned counsel, and files this Complaint for damages and Jury Demand against the Defendants, Universal Health Services, Inc., UHS of D.C., Inc., UHS of Delaware, Inc., and Wisconsin Avenue Psychiatric Center, Inc. d/b/a Psychiatric Institute of Washington, and states the following:

## **Introduction**

1.     This case arises from years of patient mistreatment and corporate malfeasance at the Psychiatric Institute of Washington, the only private psychiatric hospital in Washington, D.C. The Psychiatric Institute of Washington is owned, managed, and operated by Universal Health Services, Inc., the largest owner and operator of for-profit hospitals in the country. Universal Health Services has employed and continues to employ a brazen corporate strategy of involuntarily hospitalizing patients without cause or indication, prolonging patients' involuntary hospitalizations unnecessarily, and withholding or otherwise failing to provide therapy and treatment to those who need it. These illegal actions have been and continue to be driven by a singular focus on profit, at the expense of patient care, safety, and treatment. The Plaintiff and putative Class Members are former patients at Psychiatric Institute of Washington and are the

victims of the Defendants' misconduct and violations of state and federal law detailed throughout this Complaint. Plaintiff now seeks redress for herself and similarly situated former patients of Psychiatric Institute of Washington through this legal action.

## Parties and Jurisdiction

2.      Jane Doe, individually and on behalf of a class of persons similarly situated, is the Plaintiff in this case. Ms. Doe is an adult resident of the District of Columbia. Due to the highly sensitive nature of these claims and allegations and concern over potential repercussions arising from the disclosure of her identity in connection with this lawsuit, Ms. Doe has chosen to file this action under a pseudonym.

3.      Defendant Universal Health Services, Inc. ("UHS, Inc.") is a corporation formed under the laws of the State of Delaware with its principal place of business in the Commonwealth of Pennsylvania. UHS, Inc. owns, operates, manages, and controls behavioral and psychiatric health facilities throughout the United States, including the Psychiatric Institute of Washington, in Washington, D.C.

4.      Defendant UHS of D.C., Inc. ("UHS DC") is a corporation formed under the laws of the State of Delaware with its principal place of business in the Commonwealth of Pennsylvania. UHS DC is a wholly-owned subsidiary of UHS, Inc. UHS DC is involved in the management and operation of the Psychiatric Institute of Washington, in Washington, D.C.

5.      Defendant UHS of Delaware, Inc. ("UHS Delaware") is a corporation formed under the laws of the State of Delaware with its principal place of business in the Commonwealth of Pennsylvania. UHS Delaware is the management company for UHS, Inc. and is wholly-owned by UHS, Inc. UHS Delaware is responsible for management of behavioral and

psychiatric health facilities throughout the United States, including the Psychiatric Institute of Washington, in Washington, D.C.

6.     Defendants Universal Health Services, Inc., UHS of D.C., Inc., and UHS of Delaware, Inc. are collectively referred to herein and throughout this Complaint as "UHS."

7.     Defendant Wisconsin Avenue Psychiatric Center, Inc. d/b/a Psychiatric Institute of Washington (referred to herein as "PIW") is a private, for-profit corporation formed under the laws of the State of Delaware with its principal place of business in the District of Columbia. PIW is a psychiatric facility located at 4228 Wisconsin Avenue, NW, Washington, D.C. 20016, and is responsible for the care and treatment of patients, including the Plaintiff and putative Class Members.

8.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. 1332(d), in that there is minimal diversity of citizenship, over 100 putative Class Members, and more than $5 million in controversy.

9.     This Court has personal jurisdiction over each of the Defendants in that, each such Defendant owned, operated, managed, marketed, promoted, and controlled the services provided by PIW in the District of Columbia, and have profited and continue to profit substantially from such activities.  This action arises from the Defendants' contacts created in the District of Columbia.  The Court has further personal jurisdiction over Defendant PIW in that Defendant PIW has its principal place of business in this District.

10.     Venue is proper in this Court as the events, acts, and omissions giving rise to this action occurred in this District.

## Factual Allegations for Individual and Class Relief

### A. Universal Health Services

11.     UHS, Inc. is a multi-national healthcare company that was formed in Delaware and headquartered in King of Prussia, Pennsylvania in 1979.

12.     In that same year, the company began purchasing and acquiring hospitals and medical centers throughout the country.

13.     Over the course of more than forty (40) years, UHS, Inc. has systematically acquired hospitals and medical facilities throughout the United States, and ultimately, overseas. Over time, UHS, Inc. became the country's largest owner and operator of private, for-profit hospitals.

14.     Through these acquisitions, UHS, Inc. has also become the country's largest owner and operator of private, for-profit behavioral and psychiatric health centers.

15.     UHS, Inc. owns more than 300 psychiatric and behavioral health facilities worldwide, admitting hundreds of thousands of patients per year and generating annual revenue in excess of $14 billion.[1]

16.     UHS, Inc. has more than 96,000 employees and provides services in 39 states, the District of Columbia, Puerto Rico, and the United Kingdom.[2]

17.     UHS, Inc. is a publicly traded company, and in 2024, was ranked #299 on the Fortune 500.[3]

---

[1] Universal Health Services, Inc., Investor Overview, *available at* https://ir.uhs.com/ (last visited January 28, 2025).

[2] *Id.*

[3] *Id.*

18.     UHS, Inc.'s Behavioral Health Division, in particular, has become increasingly profitable for the company.  In 2023, UHS Inc.'s Behavioral Health Division generated $6.2 billion in total net revenue, comprising roughly 43% of the company's total net revenue.

19.     At all times relevant hereto, UHS, Inc. controlled the directors, corporate officers, and management of its subsidiaries, UHS DC and UHS Delaware.

20.     In addition to receiving billions of dollars of revenue from government insurance payors, UHS, Inc. and its subsidiaries receive federal and state government funding in the form of procurement and grants.

21.     According to UHS, Inc.'s "Code of Conduct," the company purports to commit to providing "superior quality" patient care, "protect[ing] the safety, privacy, and dignity of patients at all times," treating every patient with "compassion" and ensuring that all services provided are medically necessary. *See* **Exhibit A**, UHS Code of Conduct.

22.     However, as set forth throughout this Complaint, UHS has systematically and intentionally violated its own Code of Conduct in the provision of mental and behavioral health services.

23.     In fact, as UHS has grown over the decades, the company has garnered a reputation for engaging in widespread tactics aimed at maximizing profit and shareholder returns at the expense of patient care and safety.

24.     UHS's tactics have been reported publicly, with one news source documenting that current and former employees of UHS's behavioral and psychiatric health facilities were "under pressure to fill beds by almost any method—which sometimes meant exaggerating

people's symptoms or twisting their words to make them seems suicidal—and to hold them until their insurance payments ran out."[4]

25.    According to past UHS employees, the company made it their "job" to admit patients, even involuntarily.[5]

26.    In fact, it has been reported that UHS facilities use the billing code for suicidal ideation exponentially more than the national average.[6]  The use of this code, or otherwise documenting findings of suicidal ideation, is used as a basis by UHS for involuntarily admitting patients.

27.    UHS facilities, including PIW, widely falsify patient records, inaccurately inserting codes or findings of suicidal ideation in order to compel the involuntary admission of patients, from which it can obtain substantial revenue.

28.    UHS facilities, including PIW, are chronically and systematically understaffed. According to the expose by Buzzfeed News, "[s]everal people who ran UHS hospitals said corporate bosses pushed them to cut their hospitals' staff further and further each year, regardless of the impact on employees' safety or on their ability to care for the people being admitted."[7]

29.    Ultimately, UHS behavioral and psychiatric health facilities, including PIW, are operated and controlled by UHS with a primary objective: increase the number of patients, maximize profits, increase revenue, decrease costs and overhead, and maximize shareholder value.

---

[4] Rosalind Adams, "Intake: A Buzzfeed News Investigation," BUZZFEED NEWS, December 7, 2016, *available at* https://www.buzzfeednews.com/article/rosalindadams/intake (last visited January 28, 2025).

[5] *Id.*

[6] *Id.*

[7] *Id.*

30.     UHS has been public and unabashed about its goal of maximizing profit and shareholder value through increasing patient admissions.  Indeed, in a Q3 2023 earnings call, UHS chief financial officer Steve Filton stated that "increasing occupancy is the most significant opportunity we see in our behavioral business."[8]

31.     Mr. Filton further stated that UHS has "the ability to increase occupancy significantly" into the future.[9]

32.     In another earnings call earlier that year, Mr. Filton acknowledged a corporate strategy of "simply admitting patients whose insurance will pay us more."[10]

33.     In order to effectuate the business "opportunity" presented by increased occupancy, UHS intentionally engages in tactics to promote and induce—often without the consent or agreement of patients—unnecessary stays of patients at its facilities, including PIW.

34.     The purpose of inducing unnecessary stays is to maximize the amounts billed to and recovered from insurers, including both private and public payors.

35.     To decrease costs and overhead associated with unnecessarily long stays, UHS facilities, including PIW, intentionally withhold treatment to patients, often ignoring patients for days at a time and otherwise failing to provide any therapeutic modalities.

---

[8] Morgan Gonzales, "Increasing Occupancy is 'Significant' Opportunity for UHS' Behavioral Health Business," BEHAVIORAL HEALTH BUSINESS, Oct. 26, 2023, *available at* https://bhbusiness.com/2023/10/26/increasing-occupancy-is-significant-opportunity-for-uhss-behavioral-health-business/ (last visited Jan. 28, 2025).

[9] *Id.*

[10] Tara Bannow, "UHS Finance Chief Said Company Favors Patients Whose Insurance Pays More," STAT+ NEWS, July 26, 2023, *available at* https://www.statnews.com/2023/07/26/uhs-cherry-picks-patients/ (last visited Jan. 28, 2025).

36.     To further decrease costs and overhead associated with unnecessarily long stays, UHS intentionally cuts staff and personnel in its behavioral and psychiatric health facilities, including PIW, to dangerously low levels.

37.     The low level of staffing at UHS facilities, including PIW, is insufficient to ensure safety and adequate care of patients, and this understaffing precludes the very care UHS purports to offer its patients.

38.     In 2020, the United States settled a lawsuit against UHS, Inc., UHS Delaware, and other UHS facilities, including PIW, for $122 million for their alleged violations of, *inter alia*, the federal False Claims Act.  The Justice Department's suit alleged UHS's failure to provide adequate staffing, training, and supervision of staff, regular use of improper restraint and seclusion, failure to discharge patients when hospitalization was no longer necessary, failure to develop and/or update treatment plans, and inadequate psychotherapy and discharge planning, as pertaining to beneficiaries of federal health insurance programs.[11]

39.     According to the settlement agreement, UHS, Inc., UHS Delaware, and UHS entities including PIW "submitted or caused to be submitted false claims for services provided to Medicare, Medicaid, Tricare, FEHB, and VA beneficiaries . . . resulting from UHS's (i) admission of beneficiaries who were not eligible for inpatient or residential treatment, (ii) failure to properly discharge beneficiaries when they no longer needed inpatient or residential treatment, (iii) improper and excessive lengths of stay, (iv) failure to provide adequate staffing, training, and/or supervision of staff, (v) billing for services not rendered, (vi) improper use or physical and

---

[11] United States Department of Justice, Office of Public Affairs, "Universal Health Services, Inc. And Related Entities To Pay $122 Million To Settle False Claims Act Allegations Relating To Unnecessary Inpatient Behavioral Health Services And Illegal Kickbacks," July 10, 2020, *available at* https://www.justice.gov/opa/pr/universal-health-services-inc-and-related-entities-pay-122-million-settle-false-claims-act (last visited Jan. 28, 2025).

chemical restraints and seclusion; and (vii) failure to provide inpatient acute or residential care in accordance with federal and state regulations, including, but not limited to, failure to develop and/or update individual assessments and treatment plans, failure to provide adequate discharge planning, and failure to provide required individual and group therapy."

40.    The United States alleged that UHS induced patients to seek treatment at their facilities by providing free transportation, that patients admitted to the UHS facilities did not require the care offered, and that the UHS facilities did not provide the level of care they advertised.[12]

41.    As part of its settlement, UHS, Inc. and UHS Delaware entered into a Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services.  The purpose of this Agreement was to "promote compliance with the statute, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs . . . ."

42.    As part of the Corporate Integrity Agreement, UHS, Inc. and UHS Delaware agreed, *inter alia*, to do the following:

    a.   Create a compliance officer and committee to ensure legal compliance and quality
         assurance;

    b.    Develop and implement written standards regarding the operation of UHS's
         compliance program, addressing medical necessity of patient admissions,
         appropriate use of involuntary commitment, medical necessity of continuing
         stays, the requirement to provide active and individualized treatment, physician
         participation in and supervision of care, the proper use and monitoring of physical

---

[12] *Id.*

and chemical restraints and seclusion, interdisciplinary, patient-centered, care planning, and appropriate staffing levels, qualification, licensure, supervision, and training to meet patients' needs and to comply with Federal and State requirements;

c.  Develop and implement a training plan for employees, owners, officers, directors, contractors, subcontractors, and agents;

d.  Retain a monitoring team to assess, *inter alia*, the effectiveness, reliability, and thoroughness of UHS's internal quality control systems, UHS's and its behavioral health facilities' response to quality-of-care issues, UHS's proactive steps to promote its behavioral health facilities' provision of patient care in accordance with law, and UHS's steps to implement processes for identifying staffing-related issues or concerns at behavioral health facilities;

e.  Engage an independent review organization to review claims submitted by UHS behavioral health facilities; and

f.  Develop and implement a centralized annual risk assessment and internal review process to identify and address risks, including but not limited to risks associated with the standards of care, staffing, and submission of claims for items and services furnished to Medicare and Medicaid program beneficiaries.

43.  In July 2022, the United States Senate Committee on Finance and Senate Committee on Health, Education, Labor, and Pensions launched an investigation into allegations of abuse and neglect at facilities owned and operated by UHS, Inc., in addition to other providers of mental health residential treatment facilities.

44.     The Senate Committees released a report titled "Warehouses of Neglect: How Taxpayers are Funding Systemic Abuse in Youth Residential Treatment Facilities."[13]

45.     The Committees found that residential behavioral health providers, including UHS, Inc., "optimize per diems by filling large facilities to capacity and maximize profit by concurrently reducing the number and quality of staff in facilities."[14]

46.     Among other key findings, the Committees' investigation uncovered the following:

    a.     Children suffer "inadequate provision of behavioral health treatment."[15]

    b.     "The harms children in [Residential Treatment Facilities] experienced are the direct, causal result of an operating model that incentivizes providers to optimize revenues and operating and profit margin."[16]

    c.     Providers including UHS, Inc. "offer minimal therapeutic treatment in deficient physical settings with lean staff composed of non-professionals, which maximizes per diem margins."[17]

---

[13] United States Senate, "Warehouses of Neglect: How Taxpayers Are Funding Systemic Abuse in Youth Residential Treatment Facilities," *available at* https://www.finance.senate.gov/imo/media/doc/sfc_report_warehouses_of_neglect.pdf (last visited Jan. 28, 2025); *see also* United States Senate Committee on Finance, "Wyden Investigation Exposes Systemic Taxpayer-Funded Child Abuse and Neglect in Youth Residential Treatment Facilities," June 12, 2024, *available at* https://www.finance.senate.gov/chairmans-news/wyden-investigation-exposes-systemic-taxpayer-funded-child-abuse-and-neglect-in-youth-residential-treatment-facilities (last visited Jan. 28, 2025).

[14] *Id*. at 3.

[15] *Id*.

[16] *Id*. at 4.

[17] *Id*.

    d.   Treatment advertised by providers, including UHS, Inc., "often does not offer" and providers "fail to individualize treatment plans and administer the therapeutic behavioral health care described in plans."[18]

    e.   "[U]nchecked abuse" at providers' facilities, including those owned and operated by UHS, Inc.[19]

    f.   Employment by providers, including UHS, Inc., of "unqualified or inadequately trained staff and staff [who] routinely fail to discharge their duties."[20]

    g.   "[U]nsafe and unsanitary conditions" at providers' facilities, including those owned and operated by UHS, Inc.[21]

    h.   Providers, including UHS, Inc. "[e]xploit[ ] corporate structures" in order to "evade oversight."[22]

47.    On September 27, 2024, a Richmond, Virginia jury delivered a $360 million verdict against UHS, Inc., UHS Delaware, and Cumberland Children's Hospital (a facility owned and operated by UHS, Inc.) arising from sexual assaults by the facility's medical director.

48.    This lawsuit alleged that this UHS, Inc. medical director sexually assaulted numerous patients during femoral pulse examinations.[23]

---

[18] *Id*.

[19] *Id*.

[20] *Id*. at 5.

[21] *Id*.

[22] *Id*. at 6.

[23] "Jury Awards $300 Million to Women Who Alleged Sex Abuse by Doctor at a Virginia Children's Hospital," U.S. NEWS & WORLD REPORTS, Sept. 28, 2024, *available at* https://www.usnews.com/news/us/articles/2024-09-28/jury-awards-300-million-to-women-who-alleged-sex-abuse-by-doctor-at-a-virginia-childrens-hospital (last visited Jan. 28, 2025).

49.     Even more recently, in December 2024, a lawsuit was brought against UHS, Inc., alleging that more than 100 minor patients at UHS facilities throughout the state of Illinois were systematically sexually abused.[24]

50.     The above-discussed lawsuits, settlements, investigatory findings, and jury verdicts demonstrate the culture, corporate strategy, and mindset at UHS, Inc. and its subsidiaries, namely the company's systemic lawlessness and its focus on profit over patient safety and treatment.

51.     UHS's conduct has caused PIW patients, for years, to be chronically mistreated, manipulated, and disregarded, in violation of federal and District of Columbia law.

**B. Psychiatric Institute of Washington**

52.     PIW is a 130-bed psychiatric hospital in Washington, DC.

53.     PIW was opened in 1967 as an acute, short-term, private facility.  PIW offers inpatient and outpatient behavioral and psychiatric services for both adults and adolescent-age children.

54.     PIW is the only private, for-profit hospital in the District of Columbia that is solely focused on providing care for psychiatric and substance use disorders.

55.     In 2014, UHS, Inc. acquired PIW.  Through present day, PIW is operated by UHS, Inc. and its subsidiaries and agents, UHS DC and UHS Delaware.

56.     PIW is part of UHS, Inc's Behavioral Health Division.

---

[24] "More than 100 former patients file major lawsuit against Universal Health Services for alleged abuse," FOX 32 NEWS CHICAGO, Dec. 12, 2024, *available at* https://www.fox32chicago.com/news/illinois-lawsuit-universal-health-services (last visited Jan. 28, 2025).

57.    Since its acquisition of PIW, UHS, Inc. controls and at all relevant times hereto controlled the directors, officers, and management of PIW, either directly or through its subsidiaries and agents, UHS DC and UHS Delaware.

58.    PIW publicly advertises adult psychiatric services (accommodating both voluntary and involuntary admissions), substance use and co-occurring disorders, and trauma and stress-related disorders.[25]

59.    PIW also advertises inpatient mental health treatment for teens and adolescent children.[26]

60.    PIW publicly and falsely advertises and represents that it provides a number of "treatment components"[27] including:

    a.   Crisis stabilization

    b.   Individualized treatment planning;

    c.   Therapy focused on issues of trust, sexuality, individuation, intimacy and acting out;

    d.   Psychopharmacology;

    e.   Art and expressive therapies;

    f.   Process groups;

    g.   Self-esteem groups;

    h.   Living skills;

---

[25] Psychiatric Institute of Washington, Treatment & Services, *available at* https://psychinstitute.com/treatment-services/ (last visited Jan. 28, 2025).

[26] *Id.*

[27] Psychiatric Institute of Washington, Adult Psychiatric Services, *available at* https://psychinstitute.com/treatment-services/adults/adult-psychiatric-services/ (last visited Jan. 28, 2025).

      i.    Therapeutic recreation activities;

      j.    Group therapy; and

      k.    Family meetings and family support.

61.    PIW publicly and falsely advertises and represents that it conducts an "admissions process "that includes a "clinical assessment center" providing a "no-cost psychiatric evaluation."[28]

62.    PIW publicly, and falsely, advertises and represents that "[h]aving an assessment in no way obligates you to any form of treatment" and rather, "treatment approach[es]" will be "recommend[ed]" by an "assessment and referral counselor."[29]

63.    On information and belief, each patient receiving mental health services at PIW is provided with a Notice or Declaration of Patient/Resident Rights representing, *inter alia*, that all patients will be treated with dignity, compassion, and respect, receive care by competent personnel in the least restrictive environment appropriate to their needs, be informed about their care and medical treatment, have an opportunity to participate in the implementation of a plan for care, be free chemical or physical restraints that are not medically necessary, and otherwise be free from unnecessary seclusion, abuse, or neglect.

64.    Despite its representations, PIW regularly and systematically violates its own Declaration of Patient/Resident Rights and violated its own Declaration of Patient/Resident Rights in the treatment of Plaintiff and the putative Class Members.

---

[28] Psychiatric Institute of Washington, Admissions Process, *available at* https://psychinstitute.com/admissions/admissions-process/ (last visited Jan. 28, 2025).

[29] Psychiatric Institute of Washington, Admissions FAQs, *available at* https://psychinstitute.com/admissions/admissions-faqs/ (last visited Jan. 28, 2025).

65.    In addition to being a private healthcare facility, PIW contracts with the District of Columbia's Department of Behavioral Health (DBH) to provide acute inpatient psychiatric care services in the District.

66.    PIW is a "Core Services Agency" (CSA): a DBH-certified community-based provider that is under contract with DBH to provide mental health services.

67.    For example, in May 2022, PIW entered into a year-long $586,180.00 contract[30] with DBH to provide acute inpatient psychiatric care services to involuntary patients for a maximum stay of fifteen (15) days per patient. Upon information and belief, that contract has been renewed and remains in place through present day.  Contract, attached as **Exhibit B**.

68.    This contract provides that subject to the availability of inpatient beds, PIW "shall provide acute inpatient psychiatric care and treatment services to persons referred by DBH for admissions on an involuntarily basis . . . ."  *Id*. at § C.5.3.3.

69.    Under this contract, PIW promised to "comply with all applicable standards regarding informed consent to treatment" and further promised to comply with standards of care and provide services "in the least restrictive, most natural setting which is available and appropriate to the needs of the patient."  *Id*. at § C.5.2.1(f).

70.    Under this contract, PIW promised to "conform to federal and District [of Columbia] law and regulations."  *Id*. at § C.7.1.1.

71.    Under this contract, PIW promised to comply with "the District of Columbia Human Rights Act of 1977 . . . and its implementing regulations."  *Id*. at § C.7.2.1.

---

[30] This contract provides options for subsequent years, and the total contract price (over five years) is $3,110,585.00.

72.     Under this contract, PIW promised to "comply with the District of Columbia's civil commitment laws and the DBH protocol for the emergency involuntary hospitalization of persons requiring assessment and acute psychiatric care." *Id*. at § C.7.7.

73.     This contract provides that subject to the availability of inpatient beds, PIW "shall make every reasonable effort to admit … all persons authorized to receive Acute inpatient care services by the DBH Access Help Line, within four (4) hours of transfer…" *Id*. at § C.7.4.1.

74.     This contract provides a maximum of $3,110,585.00 in reimbursement by the District over the five-year contract period for services provided to patients without third party insurance and who are not eligible for Medicaid or Medicare Part A. For patients with private insurance, the contract provides that PIW will bill the patient's insurance carrier. *See id*. at § C.5.5.2.

75.     PIW's obligation under the Contract is to provide acute inpatient psychiatric care services twenty-four (24) hours a day, seven (7) days a week for all patients that are referred by DBH, subject to inpatient bed availability, irrespective of whether the patient is insured or uninsured.

76.     PIW often receives patients and admits them involuntarily pursuant to a form "FD-12." A form FD-12 is used "[w]hen there is reason to believe that a person is mentally ill and, because of such illness, is likely to injure self or others if not immediately detained." DBH Policy 220.1 at 5, attached as **Exhibit C**.

77.     Pursuant to an FD-12, a person may be "taken into custody without a warrant and transported/presented for involuntary emergency admission to a public or private hospital or the DBH Comprehensive Psychiatric Emergency Program (CPEP)." *Id*.

78.     DBH policy is clear that the "FD-12 application only represents the first step in the process of involuntary admission of an individual, and only guarantees that the person can be transported/presented for assessment (observation and diagnosis)." *Id*.

79.     Under the FD-12 process, "[a]ll applicants for admission will be carefully screened and evaluated and alternatives to hospitalization must be considered before the decision to admit is made." *Id*.

80.     PIW receives a considerable percentage of its patients through the FD-12 process, and indeed, admits the majority of FD-12 patients in the District of Columbia.[31]

81.      PIW does not consider "alternatives to hospitalization" when receiving patients pursuant to an FD-12, as DBH policy dictates.  Instead, PIW, under the control and operation of UHS, systematically involuntarily hospitalizes and detains these patients regardless of their presenting symptoms, medical necessity, and diagnoses and regardless of whether alternatives to hospitalization are indicated, necessary, or in the best interests of the patient.

82.     PIW moreover receives patients who have been detained pursuant to D.C. Code § 21-521, which permits an officer, physician, or qualified psychologist "who has reason to believe that a person is mentally ill" to "make application for his admission thereto for purposes of emergency observation and diagnosis."

83.      Under D.C. Code § 21-522(a), "the administrator of a private hospital may . . . admit and detain for purposes of emergency observation and diagnosis a person with respect to whom application is made under section 21-521, if the application is accompanied by a certificate of a psychiatrist, qualified physician, or qualified psychologist on duty at the hospital

---

[31] *See* Jenna Portnoy, "D.C. council panel to examine abuses at psychiatric hospital," WASHINGTON POST, Oct. 27, 2024, *available at* https://www.washingtonpost.com/dc-md-va/2024/10/27/dc-psychiatric-hospital-abuse-allegations/ (last visited Jan. 28, 2025).

or the Department stating that he or she: (1) [h]as examined the person; (2) [i]s of the opinion that the person has symptoms of a mental illness and, because of the mental illness, is likely to injure himself or others unless the person is immediately detained; and (3) [i]s of the opinion that hospitalization is the least restrictive form of treatment available to prevent the person from injuring himself or others."

84.     Importantly, however, "[i]f the psychiatrist, qualified physician, or qualified psychologist determines, after examining the person who has been presented for emergency observation and diagnosis, that the person is not mentally ill, not likely to injure himself or others unless immediately detained, or that hospitalization or detention in a facility certified for emergency observation and diagnosis is not the least restrictive form of treatment, the psychiatrist, qualified physician, or qualified psychologist **shall not admit the person** to the hospital or facility as an inpatient and shall facilitate the person's outpatient treatment through the Department or a provider, as appropriate."  D.C. Code § 21-522(c) (emphasis added).

85.     Through the years, and particularly since being acquired by UHS, PIW has come under increased public scrutiny for its practices concerning involuntary hospitalizations and commitments.

86.     Under control and operation of UHS, PIW has systematically and chronically violated D.C. law by admitting patients when they were "not mentally ill, not likely to injure [themselves] or others unless immediately detained, or that hospitalization or detention . . . [was] not the least restrictive form of treatment."  D.C. Code § 21-522(c).

87.     Under control and operation of UHS, PIW has systematically and chronically failed to provide enough staff to meet the ostensible needs of its residential patients, to ensure adequate supervision of patients, and to promote and create a safe environment for patients.

88.     Under control and operation of UHS, PIW woefully fails to protect patients who are admitted under the basis that they are ostensibly dangers to themselves and/or others.

89.     PIW's failings in this regard are particularly acute in the inpatient setting, as patients are physically unable to leave the facility and are therefore forced into confinement in a perpetually dangerous environment.

90.     This lack of staffing at PIW is caused by UHS's focus on minimizing staffing expenses and overhead so it can maximize profits and shareholder value.

91.     Under the control and operation of UHS, PIW has systematically and chronically engaged in tactics to withhold or otherwise fail to provide necessary and legally-mandated treatment for involuntarily-committed patients.

92.     Under the control and operation of UHS, PIW has systematically and chronically engaged in tactics to force patients to stay, often involuntarily, at its facility longer than is medically necessary based on their symptoms, diagnoses, risk factors, or other factors.  By falsely inflating patients' diagnoses and symptoms, PIW claims that prolonged, involuntary stays are necessary.

93.     Under the control and operation of UHS, PIW has systematically and chronically withheld information and resources from patients that said patients could use to challenge their involuntary hospitalization at PIW or otherwise seek legal assistance.

94.     Under the control and operation of UHS, PIW has systematically and chronically failed to create and follow discharge plans for patients to ensure that said patients are timely and expeditiously discharged from their involuntary hospitalizations.

95.     Under the control and operation of UHS, PIW has systematically and chronically failed to implement evidence-based and verifiable psychiatric assessments to fully identify

mental ailments and conditions requiring treatment prior to inpatient hospitalization or other less-intrusive alternatives to inpatient hospitalization.

96.     Under the control and operation of UHS, PIW has systematically and chronically failed to implement evidence-based treatment plans to address patients' verified mental ailments and conditions.

97.     Under the control and operation of UHS, PIW has systematically and chronically falsified patient diagnoses, falsely charted aggression or other dangerous behavior in patients, falsely charted suicidal or homicidal ideation in patients, or otherwise made fraudulent and materially false statements in medical records to justify involuntary hospitalization and unnecessarily long stays at PIW.

98.     The aforementioned tactics are caused by and in furtherance of UHS's focus on maximizing revenue from insurance payors by unduly lengthening the stays of patients at PIW, and in turn maximizing profits and shareholder value.

99.     PIW has systematically and chronically failed to create safe environments for its involuntarily hospitalized patients, whom PIW claims are highly vulnerable.  Indeed, PIW has been publicly accused of allowing patients under its care to be abused and beaten by fellow patients, failing to provide safe facilities for patients whom PIW claims are dangers to themselves and/or others, and failing to adequately supervise patients.[32]

100.     In June 2021, non-profit Disability Rights DC, the federally mandated protection and advocacy program for individuals with disabilities in the District of Columbia, released a

---

[32] *See* Tisha Lewis, "16-year-old allegedly abused at DC psychiatric institute, suing for $30M," Fox 5 DC, Oct. 8, 2024, *available at* https://www.fox5dc.com/news/16-year-old-allegedly-abused-d-c-psychiatric-institute-suing-30m (last visited Jan. 28, 2025).

report titled, "A Disturbing Death: Lack of Oversight at the Psychiatric Institute of Washington."

Attached as **Exhibit D**.

101.    The report "examine[d] allegations of specific incidents of abuse and neglect at

PIW, as well as systemic failures in PIW's quality improvement system . . ." which DC

Disability Rights DC characterized as "very troubling." *Id*. at 4.

102.    The report discussed allegations of improper conduct by staff including sexual

abuse and assault, improper restraints and physical holds, choking, physical assaults including

punching, improper chemical restraints, lack of supervision of patients, and exposure of patients

to harmful substances including cleaning solution. *Id*. at 20-21.

103.    The report cited "surveys from 2019 and 2020 in response to a separate [Freedom

of Information Act request] to DC Health" which "reveal serious and concerning deficiencies at

PIW that violate multiple [Centers for Medicare and Medicaid Services] Conditions of

Participation, including serious nursing deficiencies." *Id*. at 23.

104.    As a result of its findings, DC Disability Rights voiced "serious concerns about

whether PIW is dedicating adequate resources to its quality improvement and risk management

systems." *Id*. at 27.

105.    In July 2022, Disability Rights DC released another report about patient neglect

and safety at PIW, titled "DO NO HARM: Multiple Incidents of Abuse and Neglect at the

Psychiatric Institute of Washington." Attached as **Exhibit E**.

106.    Disability Rights DC noted that since the release of their prior report (discussed

*supra*), "[a]llegations of abuse and neglect made by PIW patients and other stakeholders have

increased . . . ." *Id*. at 3. "Numerous patients have reported to Disability Rights DC that they did

not feel safe at PIW, that PIW is understaffed, that there are sometimes no Registered Nurses on

the units, and that they have been threatened by other patients and do not feel staff intervene to protect them." *Id*.

107.    The report noted that DC Health has documented "numerous unsafe practices" including, *inter alia*, "[i]nsufficient numbers of qualified personnel to ensure ability to provide care to all patients," an "inadequate number of Registered Nurses (RNs) and Psychiatric Counselors to provide care to patients," and failure to "appropriately document investigations and patients observations." *Id*. at 4.

108.    DC Disability Rights recommended that "PIW must examine the current staff ratios and increase staffing to levels that ensure a safe environment." *Id*. at 5.

109.    DC Disability Rights documented "systemic failures" at PIW, including inadequate staff training and support and lack of nursing administration and nursing leadership. *Id*. at 33-34.

110.    Most recently, in July 2024, DC Disability Rights produced a third report concerning PIW, this one titled "Unsafe and Unprotected: Neglect at the Psychiatric Institute of Washington." Attached as **Exhibit F**.

111.    DC Disability Rights stated that its investigations into PIW "reveal a disturbing, long-standing pattern or abuse and neglect." *Id*. at 5.

112.    This pattern includes "patients being subjected to sexual assaults, physical assaults resulting in fractures and other serious injuries, as well as an overreliance on seclusion and restraint." *Id*.

113.    DC Disability Rights documented "multiple incidents of staff misconduct and . . . neglect." *Id*. at 19.  This includes "multiple instances of staff violating the rights of patients,

failing to adequately meet the needs of PIW patients, and failing to provide required reporting." *Id*. at 20.

114.    In this report, DC Disability Rights discussed a PIW employee's complaint filed with DBH, in which the employee discloses, *inter alia*, the following:

      a.    Routine patient violence;

      b.    Lack of crisis training among staff;

      c.    Inadequate staff to patient ratios;

      d.    Inaccurate and false medical charting and documentation;

      e.    Night shift staff sleeping on the job; and

      f.    Cold temperatures inside the building, causing ice to form on windows.

115.    DC Disability Rights asserted that "PIW must make changes that put patient care above corporate concerns."  *Id*. at 27.  Moreover, "PIW staff must use treatment practices that demonstrate care and compassion for those who are hospitalized, upholding the dignity of the patients—creating an environment that does not demand seclusion and restraint but provides respite and insight."

116.    Increasing reports of abuse and neglect at PIW have spurred the D.C. City Council to investigate the facility.  On October 28, 2024, the D.C. City Council Committee on Health held a hearing to discuss PIW and the District's oversight of the facility.

117.    One witness at the hearing, a former employee of PIW, testified that PIW had one nurse and one or two technicians for 18-21 patients, which was insufficient to adequately care for and supervise the patient population.[33]

---

[33] Portnoy at *supra* n. 31.

118.    DBH investigations have shown that staff-persons at PIW receive little to no training or education, internal policies and procedures are not disseminated to staff-persons, and staff-persons are not trained as to adherence with said policies.

119.    On January 1, 2023, DBH reviewed a Major & Unusual Incident Report (MUI) submitted by an employee at PIW.  This employee reported, *inter alia*, the following:

    a.  Patients are routinely attacked by other patients;

    b.  Staff are routinely attacked;

    c.  Patient-to-staff ratio is supposed to be 1:15; however, a 1:19 ratio is not uncommon;

    d.  There is no security in the facility, because management does not want to "retraumatize" patients;

    e.  Patients are often put into seclusion due to lack of staffing;

    f.  In fall 2022, a dietician was attacked by three adolescents resulting in hospitalization and a broken orbital bone;

    g.  The new CEO of PIW "wants to increase revenue" and "[t]he capacity on each unit has been increased in an effort to do this."

    h.  Patients receive insufficient food and "patients fight over food like animals";

    i.  Fraudulent behavior takes place at PIW, including "food supplements and notes that were not accurate";

    j.  PIW engages in "[p]redatory hiring practices."

    k.  "PIW is paid a lot for poor quality of services."

    l.  Nurses at PIW are "committing fraud by saying they are taking vitals and they aren't."

m. There is unlimited overtime due to short-staffing;

n. "PIW is capitalizing on the desperate situation of the vulnerable population they serve.  Profit off of keeping them and their staff in unsafe conditions."

o. The "C-Suite is an organized crime unit."

p. Physicians have unreasonable caseloads.

MUI 1/1/23, attached as **Exhibit G**.

120.    Under the control and operation of UHS, PIW systematically and chronically fails to provide treatment, care, resources, and services for its patients, including and especially those involuntarily hospitalized patients whom PIW identifies as being vulnerable and in need of inpatient care and resources.

121.    Under the control and operation of UHS, PIW systematically and chronically endangers its patients and causes them harm, pain, suffering, and distress.

122.    Under the control and operation of UHS, PIW systematically and chronically commits and detains patients against their will without providing any therapeutic or treatment modality matched to patients' needs.

123.    Under the control and operation of UHS, PIW systematically and chronically falsifies and misrepresents its services to the public and its patient population.

124.    Under the control and operation of UHS, PIW systematically and chronically violates federal and D.C. law.

### Factual Allegations Related to the Class Representative, Jane Doe

125.    On Saturday, April 13, 2024, Jane Doe had an argument with her husband, with whom she was engaged in divorce proceedings.  After the argument, Ms. Doe proceeded to walk

around the Union Station area of Northeast, D.C., near where she lives, in order to gather her thoughts and calm down.

126.    Unbeknownst to her, her husband called the police to falsely report that Ms. Doe made a suicidal statement and falsely reported that she had a history of a specific psychiatric diagnosis.

127.    While walking on H Street, Northeast, immediately north of Union Station, Ms. Doe was surrounded by D.C. Metropolitan Police Department (MPD) officers, handcuffed, and placed in the backseat of a police cruiser.  Ms. Doe had not committed a crime and was not engaged in criminal activity, nor was she accused of such.

128.    Rather, Ms. Doe was detained because her husband falsely reported that Ms. Doe had a diagnosed mental illness and was threatening suicide.

129.    Ms. Doe had no history of mental illness and had not threatened suicide.

130.    At the time she was detained by MPD officers, Ms. Doe was walking back to her home after speaking on the phone with her spouse.

131.    Ms. Doe was transported by the MPD to the District of Columbia's Comprehensive Psychiatric Emergency Program (CPEP), located at 1905 E Street, SE, in Washington, DC.  She arrived at 1:55 p.m.

132.    CPEP "is a twenty-four hour/seven day a week operation that provides emergency psychiatric services and extended observation beds for individuals 18 years of age and older."[34]

133.    The FD-12 filed by MPD Officer Bailly stated the following: "I believe Ms. Doe has a mental illness because her husband stated that she has been diagnosed with borderline

---

[34] D.C. Department of Behavioral Health, Emergency Psychiatric Services, *available at* https://dbh.dc.gov/service/emergency-psychiatric-services (last visited Jan. 28, 2025).

personality disorder and she is threatening to kill herself." This officer was not a mental health professional and did not actively speak or assess Ms. Doe.

134.    Contrary to the officer's statement in the FD-12, Ms. Doe had never been diagnosed with borderline personality disorder and was not threatening to kill herself.

135.    At CPEP, Ms. Doe met with a physician, Wilhelm Rivera, MD, who was acting on behalf of DBH. This physician spoke with Ms. Doe for less than five (5) minutes, told her that she needed to "spend time with [her] emotions" and then immediately committed Ms. Doe involuntarily to CPEP, where she was held overnight.

136.    After less than five minutes of speaking with Ms. Doe and performing no diagnostic testing or assessment, the DBH physician, Dr. Rivera, diagnosed her with "adjustment disorder with mixed disturbance of emotions and conduct" and "anxiety disorder, unspecified." He did not diagnose her with severe depression, violent tendencies, or suicidal ideation. He did not diagnose her with a borderline personality disorder (despite that being the basis for the FD-12).

137.    Ms. Doe was not medically examined or evaluated (beyond taking her vitals and certain labs) while at CPEP and prior to the decision to involuntarily detain her.

138.    Later that afternoon, a CPEP registered nurse observed Ms. Doe "sitting in the chair reading a book" and "denied any distress and voiced no complaint or apparent distress."

139.    The CPEP registered nurse separately observed that Ms. Doe did not have any current thoughts of suicide.

140.    At 8:53 pm, one Henry Barbot, M.D. made the decision to transfer Ms. Doe to PIW. Ms. Doe never spoke or interacted with Dr. Barbot.

141.    Despite never meeting or examining Ms. Doe, Dr. Barbot also gave Ms. Doe discharge diagnoses of "adjustment disorder with mixed disturbance of emotions and conduct" and "anxiety disorder, unspecified."  She was not diagnosed with suicidal ideation or borderline personality disorder, despite those being the purported bases for her FD-12 involuntary commitment.

142.    CPEP determined that Ms. Doe had a "General Disability" pursuant to the World Health Organization's Disability Assessment Scale.

143.    At 9:17 pm, a CPEP nurse observed Ms. Doe to be "calm" and "denied pain, [suicidal ideation]/[homicidal ideation]/[auditory verbal hallucinations]."

144.    That night, CPEP personnel informed Ms. Doe that she would be transported involuntarily to PIW, and that CPEP had filed for a seven-day involuntary commitment.  Ms. Doe was stunned and terrified.

145.    Ms. Doe was not included in any discussion of transfer to PIW as part of any ostensible treatment plan.

146.    Pursuant to the FD-12, on the morning of April 14, 2024, Ms. Doe was sent via ambulance to PIW, while restrained.  She was admitted and detained involuntarily at PIW until April 17, 2024.

147.    Upon admission at PIW, she met with one Dr. Menachem Groden, at approximately 11:30 a.m.  Dr. Groden noted that Ms. Doe was "calm, cooperative, and engaged in conversation."  He further noted that "she has a 9 y/o daughter and a 6 y/o son, and . . . is currently in an acrimonious divorce with her husband."

148.    Dr. Groden noted that Ms. Doe "denie[d] any psychiatric history besides adjustment disorder, which she says was diagnosed by a therapist she was seeing due to stress

30

from her marriage and divorce."   In fact, Ms. Doe had never been diagnosed with adjustment

disorder.

149.    Dr. Groden noted that Ms. Doe "denie[d] any [history of] depressed/expansive

mood lasting for several days, denie[d] any [history of] suicide attempts."

150.    Dr. Groden noted that Ms. Doe "is very future oriented, has a strong desire to live

because she loves her children and 'wants to be there for them.'"

151.    Dr. Groden noted that Ms. Doe told her husband that she "was going to kill

herself" but that "she was 'gaslit into feeling completely powerless and overwhelmed,' and she

'said [something] she did not really mean and it was a mistake to say that.'"

152.    In fact, Ms. Doe told Dr. Groden that she made the following comment to her

husband: "It feels to me like you don't want me to exist.  It feels like you want me to jump off a

bridge."

153.    Dr. Groden noted a "calm and cooperative" appearance and behavior; "full range"

affect; "normal rate, volume, prosody" of speech; "linear and logical" thought process; "no

delusions elicited"; denial of suicide; denial of homicide; no response to internal stimuli

(hallucinations); "normal" motor; "alert and oriented to person, place, and situation"; "intact"

long term and short term memory; "above average" intelligence; "good" judgment; and "good"

awareness.

154.    Dr. Groden informed Ms. Doe that, despite his position as the resident psychiatrist

on the floor, he did not have discharge privileges.

155.    Contrary to the above findings, PIW determined that they would involuntarily

admit Ms. Doe for "severe disturbance of affect, behavior, thought process, or judgment that

31

cannot be managed safely in a less restrictive environment – on the basis of patient recently making suicidal statement although adamantly denies this was with intent to actually harm self."

156.    This "safety risk assessment" was false, inaccurate, and entirely belied by all other findings upon admission.

157.    This "safety risk assessment" was falsified by PIW, under the control and operation of UHS, to compel Ms. Doe's involuntary commitment to PIW and ensure that PIW and UHS could recover a maximum amount of revenue from her health insurance carrier.

158.    In signing this certification and falsifying Ms. Doe's records, PIW and UHS violated the medical standard of care and otherwise acted negligently.

159.    PIW and UHS violated D.C. Code § 21-522(c) by admitting Ms. Doe.

160.    As described throughout this Complaint, PIW and UHS had engaged and continue to engage in a systematic tactic of falsifying patients' safety risk assessments in order to compel their involuntarily commitments and maximize recoveries from insurance payors.  They engaged in this tactic with respect to Ms. Doe.

161.    Ms. Doe was then committed to PIW and taken to her room. Ms. Doe received no further treatment, therapy, or meaningful interaction with any employee, agent, representative or staff-person at PIW on April 14, 2024.

162.    On the following day, April 15, 2024, Ms. Doe received no treatment, therapy, or meaningful interaction with any employee, agent, representative, or staff-person at PIW.  Indeed, she was entirely ignored.

163.    That day, Ms. Doe asked to use the telephone to contact an attorney and request a probable cause hearing to challenge her involuntary admission.  The unit in which she stayed did

not have an operable telephone.  Ms. Doe was subsequently denied access by PIW personnel to use a PIW phone.

164.    On the following day, April 16, 2024, Ms. Doe met with one Dr. Ganjoo for a few minutes.  Dr. Ganjoo did not provide any therapy or treatment to Ms. Doe, nor did she have any meaningful conversation with Ms. Doe about her mood, emotions, or mental status.  Dr. Ganjoo did not ask Ms. Doe a single substantive question during this interaction.

165.    During this interaction, Dr. Ganjoo placed her palms in front of her chest for a few seconds, told Ms. Doe to "see the good in life," and left the room.

166.    Dr. Ganjoo then created a progress note that was materially false in numerous respects.

167.    The progress note falsely stated that Ms. Doe was "disheveled" (despite being in hospital garments and freshly showered), as having "constricted" affect (when she did not), as having "paranoid" delusions (when she did not have any delusions), as having an "impaired" short term memory (when, in fact, Ms. Doe had no memory deficits whatsoever), as having "poor" judgment due to "noncompliance with treatment" (when, in fact, PIW did not offer any treatment with which Ms. Doe could be noncompliant), and as having "poor" insight "based on unaware of extent of illness" (when, in fact, Ms. Doe did not have a mental illness about which she could have been unaware).

168.    Notably, however, Dr. Ganjoo stated in the mental status exam that Ms. Doe did not have any suicidal or homicidal ideation, which was correct.

169.    Dr. Ganjoo then proceeded to falsify Ms. Doe's safety risk assessment, stating (directly contrary to her previous finding of **no** suicidal or homicidal ideation): "current suicidal/homicidal ideation with intent, realistic plan, and/or available means or other serious life

33

threatening, self-injurious behaviors." Every word of this safety risk assessment was materially and knowingly false.

170. In fact, during the interaction with Dr. Ganjoo, suicidal and/or homicidal ideation was not even discussed.

171. As a result, at 2:00 pm on April 16, Dr. Ganjoo improperly and negligently certified the need for continuing involuntary psychiatric facility admission.

172. Dr. Ganjoo signed this certification despite failing to conduct any diagnostic procedure or assessment.

173. In signing this certification and falsifying Ms. Doe's records, Dr. Ganjoo violated the medical standard of care and otherwise acted negligently, intentionally, and with malice. She did so as an agent of PIW and UHS and in furtherance of their business.

174. Dr. Ganjoo prescribed Benadryl to Ms. Doe after this interaction; however, she did not diagnose Ms. Doe with any condition for which Benadryl is indicated.

175. Ms. Doe found later that the Benadryl had been prescribed for "anxiety and trouble sleeping"; however, Ms. Doe did not have anxiety nor trouble sleeping.

176. PIW personnel attempted to force Ms. Doe to take the Benadryl despite her lack of any symptoms or medical condition for which Benadryl is indicated.

177. Ms. Doe did not receive any additional therapy, treatment, or meaningful interactions with PIW staff, employees, or agents for the rest of the day on April 16, 2024.

178. On the following day, April 17, 2024, Ms. Doe, through her own ingenuity and effort, was able to contact an attorney to challenge her involuntary commitment. On April 17, 2024, the Superior Court for the District of Columbia Family Court issued an order vacating the probable cause hearing and closing the matter.

179.    On this day, after Ms. Doe was ordered to be discharged by the D.C. Superior Court, Dr. Ganjoo and PIW drastically changed their assessment of Ms. Doe.

180.    Dr. Ganjoo stated that Ms. Doe's "[p]sychiatric symptoms are resolved."

181.    A day after stating (falsely) that Ms. Doe had suicidal and homicidal ideation with "intent and a realistic plan," Dr. Ganjoo found that Ms. Doe's ideation had suddenly disappeared, stating that her "[suicidal ideation] risk" was the "same [as] the community."

182.    Dr. Ganjoo met with Ms. Doe on April 17, 2024 at approximately 12:00 p.m. or slightly after.  However, she falsely stated in Ms. Doe's medical record that she met with Ms. Doe at 8:00 a.m.  Upon information and belief, this timestamp was falsified to appear that PIW made an independent, medically-based decision to discharge Ms. Doe, as opposed to being compelled to do so pursuant to Court order.

183.    In the discharge summary, Dr. Ganjoo falsely stated that Ms. Doe was "offered groups related to coping skills, social and life skills, family dynamics, expression of feelings and stress and anger management."  In fact, Ms. Doe was not offered any of these services.

184.    In the discharge summary, Dr. Ganjoo falsely stated that Ms. Doe "had a daily treatment team meeting to address reasons for hospitalizations, medication changes, coping skills, target symptoms, and primary stressors."  In fact, Ms. Doe was not offered any of these meetings nor did such meetings take place, and PIW did not discuss or create a treatment plan for Ms. Doe.

185.    In the discharge summary, Dr. Ganjoo falsely stated that Ms. Doe "was encouraged to eat a healthy diet and exercise daily for weight modification and overall optimal health."  In fact, Ms. Doe did not receive any dietary counseling, nor was she offered nutritious food while at PIW.  In fact, Ms. Doe was not given any opportunity for exercise.

186.    In the discharge summary, Dr. Ganjoo falsely stated that "there was a plan in place for safety after discharge."  In fact, no such plan was in place or discussed, nor was any such safety plan necessary because Ms. Doe never had any suicidal ideation and continually and consistently denied such ideation (despite the false notations in her medical records).

187.    Upon discharge, a student social worker asked Ms. Doe to only sign a safety "checklist" through which she promised, *inter alia*, that she had no weapons in her home.

188.    Dr. Ganjoo certified these false statements by signing the discharge record.

189.    By falsifying Ms. Doe's discharge record, Dr. Ganjoo violated the medical standard of care and otherwise acted negligently.  She did so as an agent of PIW and UHS and in furtherance of their business.

190.    PIW did not offer Ms. Doe any individualized therapy or treatment during her entire stay.

191.    During the entire four-day stay, Ms. Doe saw a person purporting to be a therapist for a total of less than thirty (30) minutes.  These brief meetings were not therapeutic or treatment-oriented.

192.    During the entire four-day stay, PIW failed to provide Ms. Doe with any individual therapy, medication, resources relating to mental or emotional health, resources related to bodily health, opportunity for meaningful exercise, or opportunity to go outside.

193.    Ms. Doe's experience—the lack of any discernible treatment or therapy—is representative of the experiences of all patients in her unit.

194.    The unit in which Ms. Doe was detained was understaffed.  Upon information and belief, there were often more than twenty patients and only one technician and one nurse.

195.    Ms. Doe experienced substandard and unsanitary conditions at PIW. The room in which she resided lacked hot water. PIW personnel advised residents to flush the toilet three times in order to increase the temperature of the otherwise frigid showers.

196.    There were broken sinks and a malfunctioning air conditioning system that caused the air temperature to be constantly and uncomfortably cold.

197.    During her entire stay at PIW, Ms. Doe was not permitted to have outdoor access.

198.    PIW did not voluntarily offer Ms. Doe any resources to challenge her involuntary commitment, file for a probable cause hearing, or seek legal assistance.

199.    PIW and UHS caused Ms. Doe to suffer harm in the following ways:

   a.  Involuntarily committing her without sufficient or medically necessary grounds for doing so;

   b.  Misrepresenting their nature, character, and quality of their services;

   c.  Falsifying her medical records;

   d.  Falsely imprisoning her;

   e.  Failing to provide any therapy;

   f.  Failing to provide any treatment;

   g.  Billing for treatment not rendered;

   h.  Billing for unnecessary services;

   i.  Lengthening her stay without sufficient or medically necessary grounds for doing so;

   j.  Subjecting her to unsanitary conditions;

   k.  Subjecting her to unsafe conditions;

   l.  Failing to provide her with nutritious food options;

m. Refusing or otherwise failing to permit her to engage in meaningful exercise and/or go outside; and

n. Refusing or otherwise failing to provide her with necessary services, including but not limited to timely legal services and resources.

200.    As a direct and proximate result of the acts and omissions of PIW and UHS, and each of them, Ms. Doe suffered damages, including economic and pecuniary damages, emotional and mental pain and suffering, psychological pain and suffering, physical pain and suffering, inconvenience, humiliation and embarrassment, and other harms and damages.

## **Class Action Allegations**

201.    Plaintiff brings this suit as a class action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23.  This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of the provisions of Rule 23.

202.    Plaintiff seeks to represent the following Class:

**All persons involuntarily hospitalized at PIW since the date PIW was acquired by UHS, Inc.**

203.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the parties engage in discovery.

204.    **Numerosity**:  Members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class Members remains unknown at this time, the number of Class Members will be ascertainable through discovery through the Defendants' own internal records and data.

205.    This action involves common questions of law and fact, which predominate over questions affecting individual Class Members.  These common legal and factual questions include, but are not limited to the following:

a.  Whether the Defendants have failed to provide treatment to the Plaintiff and putative Class Members;

b.  Whether the Defendants have provided unnecessary treatment to the Plaintiff and putative Class Members;

c.  Whether the Defendants have falsified the medical records of the Plaintiff and putative Class Members;

d.  Whether the Defendants have involuntarily hospitalized the Plaintiff and putative Class Members without a sufficient or medically necessary basis;

e.  Whether the Defendants have lengthened the stays of the Plaintiff and putative Class Members without a sufficient or medically necessary basis;

f.  Whether the Defendants have subjected the Plaintiff and putative Class Members to unsanitary conditions;

g.  Whether the Defendants have subjected the Plaintiff and putative Class Members to unsafe conditions;

h.  Whether the Defendants have failed to provide adequate staff and personnel for the Plaintiff and putative Class Members;

i.  Whether the Defendants have misrepresented the character, nature, and quality of their services to the Plaintiff and putative Class Members;

j.  Whether Defendants engaged in a corporate strategy to unnecessarily lengthen stays of patients at PIW;

k.   Whether Defendants engaged in a corporate strategy to eliminate or minimize the number of staff and personnel at PIW;

l.   Whether Defendants engaged in a corporate strategy to falsify medical records at PIW;

m.   Whether Defendants engaged in a corporate strategy to misrepresent the nature, character, and quality of services at PIW;

n.   Whether Defendants engaged in a corporate strategy to limit or eliminate patient treatment and therapy at PIW; and

o.   Whether Defendants engaged in a corporate strategy to subject and expose patients to unsafe and unsanitary conditions at PIW.

206.   **Commonality**:  Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members have been injured through the common misconduct described herein and were subject in the same manner to the Defendants' negligent, deceptive, and unlawful conduct.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

207.   **Adequacy**:  Plaintiff will fairly and adequately represent and protect the interests of the Class in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class Members, and the infringement of the rights and damages Plaintiff has suffered is typical of other Class Members.  Plaintiff has retained counsel experienced in complex civil litigation and class action practice, and Plaintiff intends to prosecute this action vigorously.

208.   **Superiority**: Class litigation is an appropriate method for the fair and efficient adjudication of the claims involved.  Class action treatment is superior to all other available

methods for the fair and efficient adjudication of the controversy alleged herein: it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members who could not otherwise afford to litigate a complex claim against numerous corporate defendants. For those putative Class Members who could afford to litigate such a claim, it would still be economically impractical and highly inefficient. If the Plaintiff and the putative Class Members were forced to file individual actions, it would create the risk of inconsistent results and would be unnecessary and duplicative of this litigation. If the Plaintiff and the putative Class Members were forced to file individual actions, the cost of individual suits could unreasonably consume the amounts that would be recovered by the individual Plaintiff. Multiple separate lawsuits also would not serve the interests of judicial economy.

209.    Notice of a certified class action and of any result or resolution of the litigation can be provided to Class Members by first-class mail, email, or publication, or such other methods of notice as deemed appropriate by the Court.

210.    Plaintiff does not anticipate any difficulty in the management of this litigation.

## Causes of Action

### COUNT I

### Violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

211.    Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

212.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), prohibits discrimination against persons with disabilities by any program or activity receiving federal financial assistance.

213.    Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States, as defined in Section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any such program or activity. 29 U.S.C. § 794(a).

214.    Further, Section 504 prohibits methods of administration that defeat or substantially impair accomplishment of the program's objectives.

215.    Section 504 also prohibits unnecessary institutionalization and thereby requires "programs and activities" to administer their services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *See* 45 C.F.R. § 84.4(b)(2) ("most integrated setting" regulation).

216.    A "program or activity" is defined, in relevant part, as "a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other . . . local government entity) to which the assistance is extended, in the case of assistance to a State or local government; . . . [or] an entire corporation, partnership, or other private organization . . . which is principally engaged in the business of providing . . . health care." 29 U.S.C. §§ 794(b)(1)(A), 794(b)(3)(A)(ii).

217.    PIW is a "program or activity" as defined by 29 U.S.C. § 794(b)(1).

218.    Plaintiff and all putative Class Members have disabilities within the meaning of Section 504 and are therefore guaranteed the protections conferred by the statute.

219.    Defendants, by their actions and omissions as set forth herein, have violated and continue to violate the rights of Plaintiff and all putative Class Members conferred by Section 504 and its implementing regulations, 28 C.F.R. Part 41.51 and 45 C.F.R. Part 84, by limiting and continuing to limit Plaintiff's and the putative Class Members' enjoyment in the rights, privileges, advantages, and opportunities that are enjoyed by other recipients of public programs when receiving aid, benefit or service.

220.    As alleged in detail above, at all times relevant hereto, Defendants failed to provide mental health services at PIW that are timely, appropriate, and adequate for their disabled patients' needs, and otherwise provide for an inpatient residential setting that is safe, sanitary, humane, and healing, in violation of Section 504.

221.    At all times relevant hereto, Defendants administered their treatment programs in a way that denies people with mental health disabilities the type of effective services for mental health emergencies that the program exists to provide. Accordingly, Defendants administered their program in a way that substantially impairs accomplishment of its purposes with respect to individuals with mental health disabilities, in violation of Section 504.

222.    At all times relevant hereto, Defendants further discriminated against Plaintiff and all putative Class Members on the basis of disability by failing to administer programs and activities in the most integrated setting appropriate to these patients' needs, as required Section 504. Specifically, Defendants compelled and/or prolonged Plaintiff's and the putative Class Members' inpatient civil commitment when intensive community-based services or other appropriate outpatient services would have been more appropriate to their needs.

223.    As a direct and proximate result of the foregoing violations of Section 504 of the Rehabilitation Act, Plaintiff and the putative Class Members suffered and will continue to suffer pain and suffering, physical manifestations of emotional distress, and pecuniary damages.

WHEREFORE, Plaintiff and the putative Class Members hereby demand judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial but no less than $5,000,000, including compensatory damages, the costs of this action, attorney's fees, and for all other just and proper relief.

## COUNT II

**Violations of Title III of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. 12131, *et seq.***

224.    Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

225.    Title III of the Americans with Disabilities Act ("ADA") prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

226.    PIW is a "place of public accommodation" within the meaning of 42 U.S.C. § 12181(7)(F).

227.    Title III of the ADA prohibits discrimination by "subjecting an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i).

228.    Title III also prohibits discrimination when an entity provides disabled persons "with a good, service, facility, privilege, advantage, or accommodation that is different or separate form that provided to other individuals, unless such action is necessary to provide the individual . . . [an] opportunity that is as effective as that provided to others." 42 U.S.C. § 12182(b)(1)(A)(iii).

229.    Plaintiff and all putative Class Members have mental disabilities within the meaning of 42 U.S.C. § 12102(2) and are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12131(2).

230.    At all times relevant hereto, the systemic and widespread failures in Defendants' provision of inpatient mental health care services to inpatient residents at PIW violated Title III of the ADA by denying Plaintiff and the putative Class Members the rights, privileges, advantages, and opportunities that are enjoyed by other persons receiving such services, such as, but not limited to, outpatient and community-based services, shorter commitments, commitment lengths commensurate with symptoms and diagnoses, efficacious treatment, therapeutic modalities, legal resources, social work resources, and diagnostic services and assessments.

231.    As a direct and proximate result of the foregoing, Plaintiff and the putative Class Members suffered and continue to suffer pain and suffering, physical discomfort and pain, mental anguish, isolation, emotional distress, physical manifestations of emotional distress (including, anxiety, depression, sleep disorders, physical and mental sickness), embarrassment, loss of self-esteem, disgrace, fright, humiliation, and loss of enjoyment of life.

232.    As a further direct and proximate result of the foregoing violations of the ADA, Plaintiff and the putative Class Members have been prevented and will continue to be prevented

45

from performing their usual daily activities and obtaining the full enjoyment of life and have sustained loss of earnings and earning capacity and other pecuniary damages.

WHEREFORE, Plaintiff and the putative Class Members hereby demand judgment against Defendants, jointly and severally, for such injunctive relief in the form of an order enjoining Defendants from discriminating against patients on the basis of their mental health disability as described herein, attorneys' fees and costs, and all other just and proper relief.

## COUNT III

### Violations of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution
### 42 U.S.C. § 1983

233.    Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

234.    Involuntary commitment is the only context in our system of government where an individual can be deprived of physical liberty against their will in absence of evidence that they committed a crime.

235.    The involuntary commitment concept flows from two sources of power: the Police Power of the state to protect itself from breaches of the peace, and the State as *Parens Patriae*, i.e., the right and duty of the sovereign to protect the persons and property of those who are unable to care for themselves due to mental illness.

236.    As relevant here, the D.C. Department of Behavioral Health (DBH) is the agency in the District that is mandated to provide behavioral health intervention and treatment services for children, youth, and adults with mental health disorders, including emergency psychiatric care pursuant to the District's civil commitment laws.  *See* D.C. Code §§ 7-1141.05(3), 7-1141.06.

237.    DBH has the express power to "[a]rrange for, or directly provide, a Comprehensive Psychiatric Emergency Program [CPEP] for all persons identified to the

46

Department who meet criteria for admission for such services." *Id*. § 7-1141.06(8); *see id*. § 7-1141.01(3) (defining a CPEP as a "24-hour/7-days a week program providing emergency psychiatric evaluation and stabilization").

238.    "To meet this mandate, DBH executes agreements with community hospitals[,]" including PIW, "to provide acute inpatient psychiatric care services . . . ."  Ex. B at C.4.

239.    DBH has delegated this public function to PIW with respect to the first fifteen (15) days of acute inpatient care services to certain people requiring emergent mental health services in the District.

240.    Accordingly, the unlawful actions and omissions detailed herein were taken under the purview and guidance of D.C.'s statutory scheme governing involuntary admission and DBH protocols, and pursuant to PIW's contract with DBH to provide acute inpatient psychiatric care services to patients in the District.

241.    The contract with the District provides significant encouragement for PIW's actions and creates a close association of mutual benefit between the District of Columbia and Defendants.

242.    The District of Columbia's regulation of the Defendants' operations with respect to involuntarily committed patients, coupled with the contract establishing PIW as a "Core Service Agency" for patients referred by DBH, delegates powers traditionally reserved to the District, or otherwise creates a close nexus and/or joint enterprise between the District and PIW.

243.    Based on the foregoing, at all relevant times, Defendants were acting under color of state (D.C.) law, when they took affirmative action to certify, admit, and confine Plaintiff and putative Class Members involuntarily.

244.    The District, and Core Service Agencies like Defendants to which the District delegates authority to confine patients in need of acute inpatient mental health care, have a duty to protect and ensure the constitutional rights of the individuals they admit involuntarily.

245.    Involuntarily civil commitment, detention, and hospitalization is subject to the Fourth Amendment to the U.S. Constitution, which guards against "unreasonable searches and seizures." U.S. Const., Amend IV.

246.    The touchstone of the Fourth Amendment is reasonableness: an official seizing and detaining a person for psychiatric evaluation or admission to a mental health facility must have probable cause to believe the person is a danger to themselves or others.  Longer detentions require more compelling evidence of dangerousness to satisfy the Fourth Amendment.

247.    The District's civil commitment law, D.C. Code §§ 21-521, *et seq*., provides that a person with respect to whom an application is made for involuntary civil commitment may be admitted and detained where a psychiatrist, qualified physician, or qualified psychologist certifies that he or she (1) has examined the person; (2) is of the opinion that the person has symptoms of a mental illness and because of said mental illness is likely to injure himself or others unless the person is immediately detained; and (3) is of the opinion that hospitalization is the least restrictive form of treatment available to prevent the person from injuring himself or others.

248.    However, when a private hospital, such as PIW, determines that a person presenting for admission "is not mentally ill, not likely to injure himself or others unless immediately detained, or that hospitalization or detention in a facility certified for emergency observation and diagnosis is not the least restrictive form of treatment," the hospital **"shall not admit the person**."  D.C. Code § 21-522(c) (emphasis added).

48

249.    The Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution imposes on the State an affirmative duty to ensure the safety and well-being of an involuntarily committed mental patient, including an affirmative duty to provide necessary medical care.

250.    At all times relevant hereto, Defendants knew Plaintiff and the putative Class Members were vulnerable individuals suffering from mental distress and/or mental illness who were committed involuntarily into Defendants' custody.

251.    By involuntarily committing the Plaintiff and the putative Class Members under authority and power conferred by the District, the Defendants entered into a special relationship with them.

252.    Defendants breached affirmative duties created by this special relationship and violated Plaintiff's and the similarly situated Class Members' clearly established constitutional rights under the Fourth, Fifth, and Fourteenth Amendments by:

   a. Subjecting Plaintiff and the putative Class Members to prolonged detention in PIW's inpatient facility when Defendants lacked probable cause to believe that these patients were likely to injure themselves or others;

   b. Subjecting Plaintiff and the putative Class Members to prolonged detention in PIW's inpatient facility when Defendants knew or should have known that less restrictive forms of treatment were available, indicated, and warranted;

   c. Admitting Plaintiff and the putative Class Members involuntarily when said patients were not mentally ill, not likely to injure themselves, or hospitalization or detention in a facility certified for observation and diagnosis was not the least restrictive form of treatment;

49

    d.   Holding Plaintiff and the putative Class Members in custody in an environment that was unsafe and otherwise failing to provide them with adequate and necessary medical care; and

    e.   Withholding or otherwise failing to provide Plaintiff and the putative Class Members with resources to challenge their involuntary commitment at PIW.

253.    At all times relevant hereto, Defendants knowingly deprived Plaintiff and the putative Class Members of their right to personal safety and protection, and the right to necessary medical care protected by the Fifth Amendment, which is secured against state intrusion pursuant to the Fourteenth Amendment.

254.    At all times relevant hereto, Defendants also knowingly deprived Plaintiff and the Class Members of their right against unreasonable seizure protected by the Fourth Amendment, which is secured against state intrusion pursuant to the Fourteenth Amendment.

255.    At all times relevant hereto, Defendants demonstrated deliberate indifference by allowing a widespread custom or policy of falsifying medical records and charts in order to compel involuntary admission of patients and/or unnecessarily prolong their involuntary hospitalizations, so as to maximize profits. On information and belief, Defendants' widespread policy or custom of unnecessarily prolonging patients' involuntary hospitalizations prioritized individuals with third party insurance coverage that "paid more" for Defendants' behavioral health services.

256.    At all times relevant hereto, Defendants demonstrated deliberate indifference by creating and promoting a widespread custom or policy of understaffing PIW, again to maximize profits, subjecting their patients to an unsanitary and unsafe custodial environment, and failing to ensure that patients needing mental health care were afforded treatment by a qualified professional.

257.    At all times relevant hereto, Defendants had actual knowledge of the deficiencies in their policy and customs and knew it would result in exactly the type of harm suffered by Plaintiff and the Class Members—to wit, subjecting individuals to involuntary hospitalizations when inpatient care was not medically necessary or indicated, and otherwise holding vulnerable individuals in need of acute mental health services in an environment that was not safe, sanitary, or therapeutic, with only substandard mental health care.

258.    Defendants' actions and omissions were so outrageous as to shock the conscience and departed substantially from accepted professional judgment in the mental health profession.

259.    As a direct and proximate result of the Defendants' foregoing violations of their constitutional rights, Plaintiff and the Class Members suffered and continue to suffer pain and suffering, physical discomfort and pain, mental anguish, isolation, emotional distress, physical manifestations of emotional distress (including, anxiety, depression, sleep disorders, physical and mental sickness), embarrassment, loss of self-esteem, disgrace, fright, humiliation, loss of enjoyment of life, pecuniary damages, and other economic and noneconomic damages.

WHEREFORE, Plaintiff and the Class Members hereby demand judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial but no less than $5,000,000, including compensatory damages, punitive damages, costs and expenses, attorney's fees, prejudgment and postjudgment interest, and for all other just and proper relief.

## COUNT IV

**Violations of the D.C. Human Rights Act of 1977, D.C. Code § 2-1401.01, *et seq*.**

260.    Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

261.    The District of Columbia Human Rights Act of 1977 ("DCHRA") is a remedial civil rights statute that is broadly construed.  The DCHRA provides that it "shall be an unlawful

discriminatory practice" … "[t]o deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" "wholly or partially for a discriminatory reason based on the actual or perceived . . . disability . . . [or] source of income . . . of any individual[.]" D.C. Code § 2-1402.31.

262.    The DCHRA, D.C. Code § 1402.31(b), provides: "It is [ ] unlawful to do any of the above said acts for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason based on the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, genetic information, disability, matriculation, political affiliation, source of income, or place of residence or business of any individual."

263.    The DCHRA further provides that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate." D.C. Code § 2-1403.16.

264.    Plaintiff and the putative Class Members are persons with a disability within the meaning of the DCHRA. D.C. Code 2-1401.02(5A).  Plaintiff and the putative Class Members also constitute aggrieved persons within the meaning of the DCHRA.

265.    "Source of income" means "the point, the cause, the form of the origination, or transmittal of gains of property accruing to a person in a stated period of time; including, but not limited to, money and property secured from any occupation, profession or activity, from any contract, agreement or settlement, from federal or District payments, court-ordered payments, from payments received as gifts, bequests, annuities, life insurance policies and compensation

for illness or injury . . . ." D.C. Code § 2-1401.02(29). This definition encompasses health insurance benefits secured from any occupation. *See id.*

266.    PIW is a "place of public accommodation" within the meaning of the DCHRA. D.C. Code § 2-1401.02(24).

267.    At all times relevant hereto, Defendants UHS, Inc. and PIW violated the DCHRA by discriminating against Plaintiff and the putative Class Members based on their mental-health related disabilities by denying them the full and equal enjoyment of the services, facilities, privileges and advantages provided by denying them the rights, privileges, advantages, and opportunities that are enjoyed by other persons receiving such services including, but not limited to, outpatient and community-based services, shorter commitments, commitment lengths commensurate with symptoms and diagnoses, efficacious treatment, therapeutic modalities, legal resources, social work resources, and diagnostic services and assessments.

268.    In addition, Defendants discriminated against the Plaintiff and putative Class Members on the basis of their "source of income" by disproportionately subjecting individuals with greater health insurance coverage to unnecessary involuntary hospitalization and/or prolonging their involuntary hospitalization until such time as insurance funds ran out, when outpatient/community-based treatment programs would have been more appropriate or otherwise indicated for Plaintiff's and other patients' needs.  In other words, consistent with the words of UHS, Inc's Chief Financial Officer in July 2023, Defendants' targeted patients with third party insurance coverage that "paid more" for PIW's behavioral health services, to the detriment of these individuals' health and welfare.

269.    Defendants' actions were based on ill will, recklessness, wantonness, maliciousness and/or willful disregard of Plaintiff's and the Class Members' rights.

270.    The DCHRA requires that "[e]very person subject to this chapter shall post and keep posted in a conspicuous location where business or activity is customarily conducted or negotiated, a notice whose language and form has been prepared by the Office, setting forth excerpts from or summaries of the pertinent provisions of this chapter and information pertinent to the filing of a complaint." D.C. Code § 2-1402.51. On information and belief, Defendants do not have any notice as required by the DCHRA posted in PIW facilities in a "conspicuous place" as would be reviewable to PIW's inpatient residents.

271.    Pursuant to the DCHRA, a person seeking relief from an unlawful discriminatory practice may obtain a variety of remedies, including but not limited to payment of compensatory damages, reasonable fees and costs, civil fines payable to the General Fund, and injunctive relief "necessary to preserve such status quo or to prevent such [irreparable] harm, including the seeking of temporary restraining orders and preliminary injunctions." D.C. Code §§ 2–1403.07, 2–1403.13, § 2–1403.16.

272.    As a direct and proximate result of the foregoing violations of the DCHRA, the Plaintiff and the putative Class Members suffered, and continue to suffer mental anguish, isolation and grief, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, humiliation, and loss of enjoyment of life. As individuals who live and/or travel in the Washington, D.C. area, there is a sufficient likelihood that Plaintiff and putative Class Members will have further encounters with PIW and are likely to suffer similar injuries and be subject to discriminatory actions.

WHEREFORE, Plaintiff and the Class Members hereby demand judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial but no less than $5,000,000, including compensatory damages, the costs of this action, attorney's fees,

injunctive relief in the form of an order enjoining Defendants from discriminating against patients on the basis of their mental health disability and source of income as described herein, punitive damages, prejudgment and postjudgment interest, and for all other just and proper relief.

## COUNT V

**Violations of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*.**

273.    Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

274.    Defendants are "persons" within the meaning of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3801, *et seq.*, ("CPPA") which means "an individual, firm, corporation, partnership, cooperative, association or any other organization, legal entity, or group of individuals however organized."

275.    Plaintiff and the putative Class Members are "consumers" within the definition set forth in D.C. Code § 28-3901(a)(2).

276.    The CPPA, D.C. Code § 28-3904, prohibits unfair and deceptive trade practices, providing that it "shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby." At all times relevant hereto, Defendants violated the CPPA by:

a.    Misrepresenting the source, sponsorship, approval, certification, characteristics, uses, benefits, or quantities of their services, specifically their inpatient mental and behavioral health treatments and therapies;

b.    Representing that their services are of a particular standard, quality, grade, style, or mode, when in fact they are of another, specifically their inpatient mental and behavioral health treatments, therapies, facilities, personnel, expertise, procedures, and processes;

c.  Misrepresenting a material fact which has a tendency to mislead and/or failing to state a material fact in a manner that tends to mislead, specifically by falsifying Plaintiff's and the putative Class Members' records and charts, and by misrepresenting the quality, nature, and characteristics of their inpatient mental and behavioral health services;

d.  Representing that a transaction confers or involves certain rights, remedies, or obligations which it does not have or involve, specifically by representing to Plaintiffs and the putative Class Members that involuntary and prolonged confinement was necessary when in fact it was not indicated, necessary, or lawful, by withholding services and resources from patients, by representing to Plaintiffs and the putative Class Members that they had certain patient rights when in fact such rights were not observed by Defendants, by representing to Plaintiffs and the putative Class Members that they would receive certain treatments and therapies when in fact they did not, by representing to Plaintiffs and the putative Class Members that Defendants adhered to a code of conduct when in fact they did not; and

e.  Falsely stating that involuntary hospitalization and inpatient mental health services were needed when, in fact, such commitment and services were not warranted, necessary, or indicated, and rather, less intensive or intrusive services were more appropriate or otherwise indicated.

277.    The practice of medicine and the provision of medical services is a "trade practice" under the CPPA.

278.    At all times relevant hereto, Defendants falsely advertised that PIW patients are provided with mental health treatment components that are in fact routinely not offered or provided, including, *inter alia*, group therapy, individualized treatment planning, family meetings/family support, and therapeutic recreation activities. These misrepresentations constitute unfair and deceptive trade practices, in violation of the CPPA.

279.    At all times relevant hereto, Defendants misrepresented that their admissions process includes a "clinical assessment" with a "psychiatric evaluation," and that "[h]aving an assessment in no way obligates you to any form of treatment" and rather, "treatment approach[es]" will be "recommended" by an "assessment and referral counselor." In fact, patients often languish at PIW without an in-person psychiatric evaluation for many days, and any evaluation that is provided is both cursory, insufficient, and not in compliance with the medical standard of care.  These misrepresentations constitute unfair and deceptive trade practice, in violation of the CPPA.

280.    At all times relevant hereto, Defendants misrepresented that their mental health services are of a high standard, when in fact patients routinely and as a matter of course receive substandard, inadequate, or nonexistent mental health care while committed to PIW.  These misrepresentations constitute unfair and deceptive trade practice, in violation of the CPPA.

281.    At all times relevant hereto, Defendants falsely represented to their patients that inpatient mental health services were needed, when in fact, such involuntary commitment was not needed or indicated, and less restrictive services were more appropriate, safer, and in the best interest of said patients.  These misrepresentations constitute unfair and deceptive trade practice, in violation of the CPPA.

282.    As alleged in more detail above, at all times relevant hereto, Defendants provided patients with a Notice of Patient/Resident Rights which falsely stated that patients will be treated with dignity, compassion, and respect, receive care by competent personal in the least restrictive environment appropriate to their needs, be informed about their care and medical treatment, have an opportunity participate in the implementation of a plan for care, be free of chemical or physical restraints that are not medically necessary, and otherwise be free from unnecessary seclusion, abuse, or neglect, etc.  These misrepresentations constitute unfair and deceptive trade practices, in violation of the CPPA.

283.    At all times relevant hereto, Defendants wholly failed to provide adequate mental health treatment services, supervision and staffing to protect patient safety, and housed residents in an environment that is not safe, sanitary, humane, or healing, and otherwise failed to treat patients with dignity and respect.  Defendants' failures were contrary to their misrepresentations to Plaintiff, the putative Class Members, and the public, and said misrepresentations therefore constitute unfair and deceptive trade practices, in violation of the CPPA.

284.    At all times relevant hereto, Defendants intentionally falsified medical records and charts in order to admit and keep committed patients under false pretenses.  These actions, false statements, and misrepresentations constitute unfair and deceptive trade practices, in violation of the CPPA.

285.    Each of these misrepresentations and omissions by the Defendants, set forth above, constitute unfair and deceptive trade practices, which are proscribed by the CPPA, D.C. Code § 28-3904, *et seq.*

286.     Each of these misrepresentations and omissions by the Defendants, set forth above, was material in that a reasonable person would attach importance to their existence or nonexistence in determining his or her choice or action in the transaction.

287.     At all times relevant hereto, the Defendants knew or had reason to know that the recipients of their misrepresentations of omissions—here, the Plaintiff and putative Class Members—would regard the information they received as important in determining his or her choice of action.

288.     At all times relevant hereto, Plaintiff and the putative Class Members acted reasonably in relying on the Defendants' statements, advertisements, and representations about the character, quality, and nature of their medical services.

289.     As a direct and proximate result of the Defendants' foregoing violations of the CPPA, Plaintiff and the putative Class Members suffered and continue to suffer pain and suffering, physical discomfort and pain, mental anguish, isolation, emotional distress, physical manifestations of emotional distress (including, anxiety, depression, sleep disorders, physical and mental sickness), embarrassment, loss of self-esteem, disgrace, fright, humiliation, loss of enjoyment of life, pecuniary damages, and other economic and noneconomic damages.

WHEREFORE, Plaintiff and the Class Members hereby demand judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial but no less than $5,000,000, including compensatory damages, statutory damages, punitive damages, treble damages, costs and expenses, attorney's fees, prejudgment and postjudgment interest, and for all other just and proper relief.

## COUNT VI

## False Imprisonment

290.    Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

291.    Throughout Plaintiff's hospitalization at PIW, Defendants and their agents, employees, and servants made materially false statements in reports and records about Plaintiff's diagnoses, symptoms, presentation, progress, and precautions with the intent and purpose of prolonging her stay at PIW and increasing the revenue and profits of UHS.

292.    Throughout Plaintiff's stay at PIW, Defendants subjected Plaintiff to a prolonged involuntary hospitalization that was not medically necessary, but instead, was due to Defendants' business objective of increasing occupancy and maximizing insurance payments.

293.    Upon information and belief, Plaintiff's experience is typical, and similarly situated Class Members have experienced widespread falsification of their safety risk assessments, progress reports, and other medical records that prolonged their involuntary hospitalizations primarily or purely for the generation of profit.

294.    Defendants' conduct in causing Plaintiff and putative Class Members to be admitted to PIW and suffer unnecessarily prolonged involuntary hospitalizations on the basis of the Defendants' materially false statements in reports and records and/or otherwise under false pretenses was intentional.

295.    Defendants' conduct amounted to an intentional and illegal restriction on Plaintiff's and the putative Class Members' freedom of movement without legal justification or process.

296.    Defendants' restraint on Plaintiff's and the putative Class Members' liberty was entirely without any sufficient legal excuse and constituted false imprisonment.

297.     Defendants' conduct in falsifying records to prolong Plaintiff's and the putative Class Members' involuntarily hospitalizations and/or otherwise prolonging Plaintiff's and the putative Class Members' involuntary hospitalizations without basis and under false pretenses amounted to actual malice, or malice in fact, as Defendants prompted by a conscious disregard of Plaintiff's and the putative Class Members' rights.

298.     As a direct and proximate result of the foregoing, Plaintiff and the putative Class Members suffered and continue to suffer pain and suffering, physical discomfort and pain, mental anguish, isolation, emotional distress, physical manifestations of emotional distress (including, anxiety, depression, sleep disorders, physical and mental sickness), embarrassment, loss of self-esteem, disgrace, fright, humiliation, loss of enjoyment of life, pecuniary damages, and other economic and noneconomic damages.

WHEREFORE, Plaintiff and the putative Class Members hereby demand judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial but no less than $5,000,000, including compensatory damages, punitive damages, costs and expenses, attorney's fees, prejudgment and postjudgment interest, and for all other just and proper relief.

## COUNT VII
### Intentional Infliction of Emotional Distress

299.     Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

300.     Plaintiff and the putative Class Members were involuntarily hospitalized and relinquished to the supervision, custody, and care of Defendants.

301.     Defendants' actions and omissions detailed herein directly contradicted the UHS "Code of Conduct" and the Notice of Patient/Resident Rights that was provided to PIW residents, in which Defendants expressly assumed to act gratuitously and/or for consideration to

render services to their patients, including providing "quality" medical care, "prioritizing patient safety," and committing to treat patients with "compassion," dignity and respect, provide treatment in the in the least restrictive environment that is appropriate for patients' treatment plan, and not to be placed in seclusion unless necessary to protect them or others from harm.

302.    At all times relevant hereto, Defendants knew their staffing was woefully insufficient to provide proper supervision, care, and mental health treatment to all of the residents at PIW and knew that such supervision and care was imperative and necessary for the safety of Plaintiff and similarly situated patients, and that the failure to provide appropriate staffing rendered patients vulnerable to injury and attack or the anticipation and fear of injury or attack by other residents, self-injury, and/or significant decline in their mental health status or welfare.

303.    At all times relevant hereto, Defendants knew that standards for appropriate, quality, and safe patient care were being disregarded at PIW, including, *inter alia*, full and effective evaluations or individualized treatment plans, diagnostic testing and assessments, and therapy and effective treatment modalities.

304.    At all times relevant hereto, Defendants knew that patients' involuntary hospitalizations were being unnecessarily prolonged when their needs were more appropriately addressed in a less restrictive setting, and/or when there was no medical basis to continue their hospitalizations and detentions.

305.    At all times relevant hereto, Defendants knew that the inpatient residential setting of PIW was not a safe, sanitary, and healing environment for patients, and that patients were not provided with adequate access to individual and group therapies, or opportunities for exercise or fresh air.

306.    Defendants' conduct in permitting PIW to become and remain woefully understaffed and failing to provide a safe, sanitary, humane, and healing environment was extreme and outrageous, and their actions in this regard were intentional and/or reckless.

307.    Defendants' conduct in withholding treatment and therapy from PIW patients, including the Plaintiff and putative Class Members, was extreme and outrageous, and their actions in this regard were intentional and/or reckless.

308.    Defendants' conduct in falsifying patient records and otherwise committing patients or prolonging their commitments, including those of Plaintiff and putative Class Members, was extreme and outrageous, and their actions in this regard were intentional and/or reckless.

309.    As a direct and proximate result of the foregoing, Plaintiff and the Class Members suffered and continue to suffer pain and suffering, physical discomfort and pain, mental anguish, isolation, emotional distress, physical manifestations of emotional distress (including, anxiety, depression, sleep disorders, physical and mental sickness), embarrassment, loss of self-esteem, disgrace, fright, humiliation, loss of enjoyment of life, pecuniary damages, and other economic and noneconomic damages.

WHEREFORE, Plaintiff and the putative Class Members hereby demand judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial but no less than $5,000,000, including compensatory damages, punitive damages, costs and expenses, attorney's fees, prejudgment and postjudgment interest, and for all other just and proper relief.

## COUNT VIII

## Negligence *Per Se*

310.    Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

311.    At all times relevant hereto, Defendants had a duty to comply with District of Columbia laws governing the provision of medical and mental health services, including the D.C. Civil Commitment Law, D.C. Code § 21-521, *et seq*., and the D.C. Mental Health Consumers' Rights Protection Act. D.C. Code § 7-1231.01, *et seq.*

### *The D.C. Civil Commitment Law*

312.    The D.C. Civil Commitment Law. D.C. Code § 21-521, *et seq.*, was enacted to protect and provide procedural safeguards to individuals subjected to the civil commitment process, including emergency hospitalization. This statute was enacted for the safety and benefit of both the public in general and those receiving services in a hospital, other facility or program operated, funded or regulated by the Department of Mental Health.

313.    It is the law in the District of Columbia that persons who have been involuntarily hospitalized pursuant to this process are required to receive inpatient treatment and mental health rehabilitation services in the least restrictive environment in accordance with the highest professional standards and which will enable those in committed to treatment to return to full autonomy in their community as soon as it is clinically appropriate. *See* D.C. Code § 21-522(a)(3).

314.    It is also the law in the District of Columbia that private hospitals such as PIW "shall not admit person" presenting pursuant to the Civil Commitment Law when "the person is not mentally ill, not likely to injure himself or others unless immediately detained, or that hospitalization or detention in a facility certified for emergency observation and diagnosis is not the least restrictive form of treatment."   D.C. Code § 21-522(c).

64

315.    PIW is a hospital or other facility regulated by the D.C. Department of Mental Health, and therefore, the Defendants were required to comply with the D.C. Civil Commitment Law in the operation and management of PIW.

316.    Plaintiff and the putative Class Members are persons subject to civil commitment pursuant to D.C. Code §§ 21-521–28 and therefore are entitled to certain statutory rights, including the following:

    a.    The right to have a psychiatrist on the patient's treatment team who has conducted a personal examination provide their medical opinion upon initial involuntary admission to the hospital and at any subsequent hearing.  D.C. Code §§ 21-522, 21-524, 21-526;

    b.    The right to examination by a psychiatrist or qualified psychologist within 48 hours after admission by court order.  D.C. Code § 21-527(a)(1);

    c.    The right to "immediate release" after a psychiatrist or qualified psychologist certifies that the person is not mentally ill to the extent that he or she is likely to injure themselves or others if not presently detained. D.C. Code §§ 21-527(a)(2), 21-527(b)(1);

    d.    The right to a hearing within 24 hours after receipt of a request for continued hospitalization beyond 48 hours.  D.C. Code § 21-525; and

    e.    The right to further court review hearings concerning the need for continued involuntary commitment to treatment and of the least restrictive environment for that treatment.  D.C. Code § 21-526(b)-(c).

317.    Plaintiff and the putative Class Members are also statutorily entitled to the

right to communicate with others, receive mail, and be free from seclusion and restraint of any form that is not medically necessary or that is used as a means of coercion, discipline, convenience, or retaliation. D.C. Code §§ 21-561, 563.

318.    D.C. Code § 21-562 further provides that "[a] person detained as an emergency involuntary patient by or committed to the care of the … a provider, or a hospital for mental illness shall, during the detention or commitment, be entitled to medical and psychiatric care and treatment."

319.    At all times relevant hereto, Defendants breached their duties under the D.C. Civil Commitment Law with respect to the treatment of Plaintiff and the putative Class Members.

320.    Specifically, Defendants were negligent *per se* in their operation, administration and staffing of PIW, specifically by violating the statutory rights of Plaintiff and all putative Class Members under the D.C. Civil Commitment Law by failing to provide sufficient staffing of psychiatrists to fully and competently examine patients within 48 hours of admission; admitting patients when they were not mentally ill, not likely to injure themselves or others, or when hospitalization was not the least restrictive form of treatment available; failing to provide medical opinions for use in subsequent scheduled court review hearings; failing to provide adequate resources to patients to challenge their civil commitments; and failing to provide adequate communication to patients concerning their civil commitment.

321.    Defendants' negligence *per se* in violating the D.C. Civil Commitment Law directly and proximately caused Plaintiff's and the putative Class Members' commitments to be unnecessarily prolonged and directly and proximately caused Plaintiff and the putative Class Members to experience pain and suffering, physical discomfort and pain, mental anguish, isolation, emotional distress, physical manifestations of emotional distress (including, anxiety,

depression, sleep disorders, physical and mental sickness), embarrassment, loss of self-esteem, disgrace, fright, humiliation, and loss of enjoyment of life, pecuniary damages, and other economic and noneconomic damages.

### The D.C. Mental Health Consumers' Rights Protection Act

322.    The D.C. Mental Health Consumers' Rights Protection Act, D.C. Code § 7-1231.01, *et seq.*, was enacted for the safety and benefit of consumers receiving mental health treatment and services from providers licensed or certified to provide such services in the District of Columbia.

323.    Section 7-1231.04 of the Act establishes certain standards and conditions of mental health service delivery, including, *inter alia*, the requirement that providers shall treat consumers with consideration and respect for the consumer's dignity, autonomy, and privacy, provide access to mental health services free from discrimination, and that consumers shall be free from physical, emotional sexual, financial abuse or neglect, *etc.*

324.    Section 7-1231.04 further provides that mental health services consumers "shall receive their individual and mental health services and mental health supports in the least restrictive, most integrated setting appropriate to their individual needs." As relevant here, with respect to those in residential/inpatient programs, Section 7-1231.04 provides the following additional rights:

      a.  Free communication with, and reasonable visitation by, their attorneys, clergy, family members, significant others, personal representatives and guardians;

      b.  Access to telephones to make and receive confidential calls;

    c.   Opportunities to communicate by sealed, uncensored mail (subject to inspection only if there is a reason to suspect mail may contain items, substances, or information that may be harmful), access to writing materials and postage stamps;

    d.   Freedom to wear their own clothes and maintain their personal appearance;

    e.   Reasonable opportunities for social interaction (unless free interaction would present a substantial risk of harm);

    f.   Reasonable opportunities for regular physical exercise and freedom to go outdoors at regular and frequent intervals.

325.    Section 7-2131.05, in turn, provides that consumers shall have the right to "meaningful participation" in their mental health service plans, including "the right to be informed about one's own condition and legal status, and of proposed or current services, treatment, therapies or other available alternatives."

326.    Section 7-1231.07 provides that, absent special circumstances, "no mental health services or mental health supports shall be provided absent a consumer's informed consent." *See also* D.C. Code § 7-1231.08 (requiring informed consent prior to the administering of medication).

327.    Defendants are "providers" duly licensed or certified to provide mental health services or mental health support in the District of Columbia. D.C. Code § 7-1231.02(21).

328.    At all times relevant hereto, Defendants violated their duties under the D.C. Mental Health Consumers' Rights Protection Act in their operation, administration and staffing of PIW, as it relates to the services provided to Plaintiff and the putative Class Members.

329.    Specifically, Defendants violated this Act and were negligent *per se* by failing to permit Plaintiff and the putative Class Members to have adequate and free communication with

68

others; failing to offer resources to Plaintiff and the putative Class Members regarding how to challenge their involuntary commitment or file for a review hearing; and systemically failing to provide Plaintiff and putative Class Members with adequate medical care, group or individual therapy, psychiatric medication, resources relating to mental or emotional health, resources related to bodily health, opportunities for exercise or fresh air, as would be required in accordance with an appropriate psychiatric care and medical/mental health treatment plan.

330.    Plaintiff and the putative Class Members are the class of people for whose benefit the D.C. Mental Health Consumers' Rights Protection Act and the D.C. Civil Commitment Law were designed to protect, and they suffered injuries of the type against which these statutes protect.

331.    As a direct and proximate result of the foregoing, Plaintiff and the Class Members suffered and continue to suffer pain and suffering, physical discomfort and pain, mental anguish, isolation, emotional distress, physical manifestations of emotional distress (including, anxiety, depression, sleep disorders, physical and mental sickness), embarrassment, loss of self-esteem, disgrace, fright, humiliation, and loss of enjoyment of life, pecuniary damages, and other economic and noneconomic damages.

        WHEREFORE, Plaintiff and the putative Class Members hereby demand judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial but no less than $5,000,000, including compensatory damages, punitive damages, costs and expenses, attorney's fees, prejudgment and postjudgment interest, and for all other just and proper relief.

**COUNT IX**
**Negligence**

332.    Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

333.    Plaintiff and the putative Class Members were involuntarily hospitalized and relinquished to the supervision and care of Defendants, thereby giving a duty to act with reasonable care in Plaintiff's and the putative Class Members' supervision, treatment, and care.

334.    This duty to act with reasonable care required, among other actions, Defendants to provide a safe, sanitary, humane, and healing environment to patients and otherwise treat them with dignity and respect.

335.    This duty to act with reasonable care required, among other actions, Defendants to employ and schedule of an adequate number of staff members to carry out that duty.

336.    This duty to act with reasonable care required Defendants to carry out treatment honestly, in good faith, and in the best interests of patients.

337.    In addition, in the UHS "Code of Conduct" and the Notice of Patient/Resident Rights provided to PIW residents/patients, Defendants expressly assumed to act gratuitously and/or for consideration to render services to patients which Defendants knew or should have recognized was necessary for Plaintiff's and putative Class Members' welfare and protection, including providing "quality" medical care and "prioritizing patient safety," and the commitment to provide patients with the rights to be treated with "compassion," dignity and respect, to receive treatment in the in the least restrictive environment that is appropriate for patients' treatment plans, and not to be placed in seclusion unless necessary to protect them or others from harm.

338.    In addition, based on Defendants' offerings of residential services to and by taking custody of vulnerable individuals suffering from or diagnosed with mental health disorders, the Defendants created special relationships with Plaintiff and putative Class Members.

339.    These special relationships gave rise to a duty to exercise reasonable care to protect Plaintiff and putative Class Members from reasonably foreseeable dangers of harm, including self-injury, battery or threatened or anticipated assault by other residents; to exercise reasonable care to ensure Plaintiff and putative Class Members received appropriate treatment and therapy; to exercise reasonable care to ensure Plaintiff and putative Class Members were not subjected to unsanitary or unsafe conditions; to exercise reasonable care to treat Plaintiff and putative Class Members with honesty and in the best interests of the Plaintiff and putative Class Members.

340.    Defendants breached their duty of care to Plaintiff and the putative Class Members when they failed to hire, employ, and schedule an adequate number of staff members, resulting in the lack of appropriate supervision and assignment of staff and otherwise wholly failed to provide adequate mental health treatment and individualized treatment plans, and provide a safe, sanitary, humane, and healing environment to patients or otherwise treat them with dignity and respect.

341.    Defendants also breached their duty of care when they admitted more patients than could safely be supervised and provided with medical/mental health treatment by their limited staff.

342.    Defendants also breached their duty of care by withholding treatment and therapy from Plaintiff and the putative Class Members.

343.    Defendants also breached their duty of care by subjecting Plaintiff and the putative Class Members to unsafe and unsanitary conditions at PIW.

344.    Defendants also breached their duty of care by falsifying treatment records of Plaintiff and putative Class Member or otherwise committing and prolonging the commitment of Plaintiff and putative Class Members under false pretenses.

345.    As a direct and proximate result of the foregoing, Plaintiff and the putative Class Members suffered and continue to suffer pain and suffering, physical discomfort and pain, mental anguish, isolation, emotional distress, physical manifestations of emotional distress (including, anxiety, depression, sleep disorders, physical and mental sickness), embarrassment, loss of self-esteem, disgrace, fright, humiliation, loss of enjoyment of life, pecuniary damages, and other economic and noneconomic damages.

WHEREFORE, Plaintiff and the putative Class Members hereby demand judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial but no less than $5,000,000, including compensatory damages, punitive damages, costs and expenses, attorney's fees, prejudgment and postjudgment interest, and for all other just and proper relief.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Drew LaFramboise*
Veronica Nannis (# 485151)
Drew LaFramboise (# 1018140)
Lacey McMullan (#1012025)
**JOSEPH, GREENWALD & LAAKE, P.A.**
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770-1417
Ph: (240) 553-1209

F: (240) 553-1740
vnannis@jgllaw.com
dlaframboise@jgllaw.com
lmcmullan@jgllaw.com

Thomas W. Keilty (*pro hac vice* anticipated)
**KEILTY BONADIO**
One South Street
1 South Street, Suite 2125
Baltimore, MD 21202
(410) 469-9953
tkeilty@kblitigation.com

*Counsel for Plaintiff and the Putative Class*