**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JANE DOE, *et al.*,

*Plaintiffs*,

v.

UNIVERSAL HEALTH SERVICES, INC., *et al.*,

*Defendants*.

Civil Action No. 25-00312 (AHA)

**Memorandum Opinion**

The plaintiffs, former patients at the Psychiatric Institute of Washington ("PIW"), sue the institute and two related corporate entities—Universal Health Services, Inc. ("UHSI") and UHS of Delaware, Inc. ("UHSD")—alleging they have systemically exposed patients to unsafe and unsanitary conditions, subjected patients to violence and mistreatment, and hospitalized patients longer than needed to increase profits. The defendants move to dismiss. The court concludes it lacks personal jurisdiction over UHSI and dismisses the claims against it. And the court concludes the following claims survive against the remaining defendants: disability discrimination under the Americans with Disabilities Act ("ADA") and D.C. Human Rights Act ("DCHRA"), source-of-income discrimination under the DCHRA, unfair and deceptive trade practices under the D.C. Consumer Protection Procedures Act ("CPPA"), false imprisonment, intentional infliction of emotional distress, negligence, and negligence per se against both PIW and UHSD; disability discrimination under the Rehabilitation Act of 1983 against UHSD; and violation of the Fifth Amendment under 42 U.S.C. § 1983 against PIW.

## I. Background[1]

The plaintiffs are five people who were admitted for inpatient psychiatric treatment at PIW, "the only private psychiatric hospital in Washington, D.C." ECF No. 22 ¶¶ 1, 24–28. Their complaint details ways in which PIW has allegedly engaged in persistent and systemic misconduct, as well as the individual experiences of each plaintiff at PIW.

According to the complaint, the systemic problems at PIW include keeping patients hospitalized longer than needed to increase profits, subjecting patients to violence and abuse, and providing inadequate and unsanitary conditions that neglect basic needs. *Id.* ¶¶ 3–22.

The complaint alleges PIW has a business strategy of hospitalizing people without their consent or cause and unnecessarily prolonging hospitalization. *Id.* ¶¶ 3, 6–7. This is achieved by a practice of routinely falsifying and exaggerating symptoms in medical records, a policy of keeping patients for 48 hours after they ask to be discharged and not discharging patients on weekends, and a pattern of prolonging the hospitalization of patients who have private insurance. *Id.* ¶¶ 6–7, 12.

The complaint next alleges that PIW subjects patients to violence and abuse. *Id.* ¶ 21. Patients at PIW experience patient-on-patient and staff-on-patient verbal and physical abuse. *Id.* ¶¶ 21, 140; *see, e.g.*, *id.* ¶¶ 185–86, 322–23, 329, 333, 337, 367. According to the complaint, PIW routinely uses chemical restraints on patients as coercion, discipline, convenience, or retaliation. *Id.* ¶ 22.

The complaint also alleges that the conditions at PIW are unsafe and inadequate. PIW lacks sufficient qualified staff, resulting in patients having little interaction with doctors and mental health professionals. *Id.* ¶¶ 14–16. And PIW does not provide or implement individualized and

---

[1] As required at this stage, the court accepts the complaint's well-pled allegations as true and draws all reasonable inferences in the plaintiffs' favor. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

comprehensive treatment plans, does not include patient input in treatment planning, and does not regularly assess patients' readiness for discharge. *Id.* ¶¶ 8–10. The complaint further alleges that the technicians on staff are unable to properly monitor PIW's units and routinely neglect and mistreat patients. *Id.* ¶¶ 16, 21. PIW's staff fail to adequately respond to physical altercations or dangerous situations. *Id.* ¶ 20. In addition, the living conditions are unsanitary, dangerous, and humiliating, and patients are deprived of basic needs. *Id.* ¶¶ 17–20.

The complaint then details each of the five plaintiffs' encounters with PIW:

1. Plaintiff Steven Michael Golden, Jr., voluntarily admitted himself to PIW after having suicidal ideations and attempting suicide. ECF No. 22 ¶¶ 169, 173. When he arrived, staff put him in a "holding cell" and left him alone for hours without food or water. *Id.* ¶¶ 176–77. Throughout his time at PIW, Golden felt threatened by other patients, who would scream homophobic slurs and have violent outbursts. *Id.* ¶¶ 185–86. Shortly after admitting himself, Golden asked about the process to be discharged. *Id.* ¶ 189. He was told that under PIW policy voluntarily admitted patients who ask for discharge would be held for 48 more hours and would not be discharged on weekends. *Id.* ¶¶ 191–92. Golden spent his first 36 hours at PIW repeatedly asking to be seen by a doctor, but his requests were ignored. *Id.* ¶ 190. PIW did not provide him with any mental health counseling or therapy during the entirety of Golden's time there. *Id.* ¶ 196. A physician eventually met with him for 10 minutes, simply to tell Golden that he would be prescribed additional medication. *Id.* ¶¶ 195, 220. According to the complaint, PIW's records incorrectly state that a physician meeting occurred within 24 hours of admission and inaccurately describe Golden's medical history. *Id.* ¶¶ 220–23. Golden eventually signed paperwork indicating that he would be discharged "against medical advice" and left PIW after five days. *Id.* ¶¶ 197, 216. As a result of

his experiences in PIW's inpatient program, Golden was diagnosed with post-traumatic stress disorder and was unable to return to work due to the trauma he experienced. *Id.* ¶¶ 212–15.

2. Plaintiff Jane Doe #1 was involuntarily admitted to PIW following a false report to the police. *Id.* ¶¶ 227, 256. After an argument, Jane Doe #1's husband made a false report to the police that Jane Doe #1 made a suicidal statement and had a history of psychiatric diagnoses. *Id.* ¶¶ 226–27. Police officers transported her to D.C.'s Comprehensive Psychiatric Emergency Program, where she spoke with a physician for less than five minutes and was diagnosed with "adjustment disorder with mixed disturbance of emotions and conduct" and "anxiety disorder, unspecified." *Id.* ¶¶ 232, 236–37. District of Columbia personnel informed Jane Doe #1 that she would be transported to PIW for a seven-day involuntary commitment. *Id.* ¶ 245. Upon admission to PIW, Jane Doe #1 met with a physician, who falsely noted that she had a history of adjustment disorder. *Id.* ¶¶ 248–49. The physician also noted that Jane Doe #1 was "calm and cooperative," "future oriented," and denied any history of suicide attempts or depressed mood lasting for several days. *Id.* ¶¶ 248–55. Despite the physician's findings, PIW determined that it would involuntarily admit Jane Doe #1 for "severe disturbance of affect, behavior, thought process, or judgment that cannot be managed safely in a less restrictive environment – on the basis of patient recently making suicidal statement although adamantly denies this was with intent to actually harm self." *Id.* ¶ 256. On her third day at PIW, Jane Doe #1 again met with a physician, who falsely noted that Jane Doe #1 was "disheveled," had "paranoid" delusions, and had "poor" insight "based on unaware of extent of illness." *Id.* ¶ 268. The physician also stated in the mental status exam that Jane Doe #1 did not have any suicidal or homicidal ideation but then falsely stated in the risk assessment that Jane Doe #1 had "current suicidal/homicidal ideation" and certified the need for continuing involuntary psychiatric facility admission. *Id.* ¶¶ 269–70, 272–73. On her fourth day at PIW, Jane

Doe #1 contacted an attorney to challenge her involuntary commitment, and the Superior Court for the District of Columbia Family Court ordered her to be discharged. *Id.* ¶¶ 279–80. After the court's order, Jane Doe #1 again met with a physician, who made numerous false representations in the discharge statement, including regarding the resources and programs offered to Jane Doe #1 during her time at PIW. *Id.* ¶¶ 280–90.

3. Jane Doe #2 is the minor child of Plaintiff J.H. *Id.* ¶ 302. After Jane Doe #2 began suffering from suicidal ideations and attempted to harm herself, J.H. signed paperwork to have her admitted to PIW. *Id.* ¶¶ 304–07. Upon intake at PIW, Jane Doe #2 was diagnosed with an "unspecified mood effective disorder," with significant psychiatric findings being that she was "confused/combative" and "depressed," but in fact, Jane Doe #2 was cooperative and not combative during intake. *Id.* ¶¶ 309–10. Based on the intake assessment, Jane Doe #2 was supposed to be checked on every 15 minutes, but she was often left alone for hours on end. *Id.* ¶ 313. The patients in the two adolescent units were consistently unsupervised, and Jane Doe #2 observed numerous violent altercations between minors. *Id.* ¶¶ 318, 321. Jane Doe #2 experienced violence herself. On one occasion, a staff member slammed Jane Doe #2 into the wall, threw her on the ground, and shoved her knee into Jane Doe #2's neck and back, leaving her bruised. *Id.* ¶¶ 325–26. On another occasion, a male patient cornered Jane Doe #2 in a secluded area and forcibly grabbed her breasts. *Id.* ¶ 329. At one point, Jane Doe #2 started to harm herself in the bathroom, and rather than offering any treatment or intervention, a staff member shouted at Jane Doe #2 that she was overreacting and sat her in a chair in the hallway. *Id.* ¶ 337. Jane Doe #2 was not provided with any mental health counseling or psychotherapy sessions during her time at PIW, and she had only limited interactions with doctors or mental health professionals. *Id.* ¶ 340. Jane Doe #2's medical records include false assessments signed by three doctors. *Id.* ¶¶ 341–42. Jane

Doe #2 was eventually permitted to speak with her mother, J.H., who filled out paperwork to have her daughter discharged "against medical advice." *Id.* ¶¶ 344–46. Following her encounter with PIW, Jane Doe #2 struggled with severe trauma symptoms for approximately two years. *Id.* ¶ 351.

4. John Doe #1 was involuntarily committed to PIW after being hospitalized because he called 911 to report that he was having suicidal ideations. *Id.* ¶ 356. While his medical records state that his admission was voluntary, John Doe #1 was never given the option to refuse his transfer to PIW. *Id.* ¶ 357. When John Doe #1 met with a physician for his intake process, he told them he wanted to leave but was told that the minimum time spent at PIW is a week. *Id.* ¶¶ 362–63. Throughout his time at PIW, John Doe #1 felt unsafe and observed numerous instances of physical violence involving other patients. *Id.* ¶¶ 365–71. John Doe #1 was not provided with the opportunity for one-on-one therapy with a mental health professional, and his interactions with doctors lasted only one to three minutes and were not therapeutic. *Id.* ¶¶ 378–79. John Doe #1's medical records falsely state that he participated in group exercises and that he was encouraged to eat a healthy diet and exercise daily. *Id.* ¶¶ 385–86. On his second day at PIW, John Doe #1 asked to be discharged immediately, but he was told that he could not be discharged until Friday because he would be on a 48-hour hold and would likely need to stay until the following Monday because PIW does not discharge patients on the weekend. *Id.* ¶ 382. Due to John Doe #1's constant urging and advocacy, however, his discharge was processed in time for him to be released on Friday, his fourth day at PIW. *Id.* ¶ 383. John Doe #1 was traumatized following his time at PIW. *Id.* ¶ 384.

5. John Doe #2 was involuntarily committed at PIW after his parents notified the police that he was feeling suicidal. *Id.* ¶¶ 390–92. While his intake was being conducted, a patient punched John Doe #2 in the face. *Id.* ¶ 394. During his commitment, John Doe #2 witnessed PIW staff members verbally and physically assault patients, and he felt physically in danger. *Id.* ¶¶ 399,

404. John Doe #2's mother attempted to facilitate his discharge, but PIW personnel rejected her efforts. *Id.* ¶ 396. John Doe #2 did not receive any individualized therapy or counseling during his commitment. *Id.* ¶ 397. He was given several psychotropic medications, none of which he had ever been prescribed or taken before. *Id.* ¶ 398. John Doe #2 ultimately signed an "against medical advice" form requesting his discharge, and he was discharged following a 48-hour hold. *Id.* ¶ 405. After John Doe #2's discharge, his symptoms became worse, and roughly two weeks later, he attempted suicide at home. *Id.* ¶¶ 406–07. John Doe #2's mother called the District's Department of Behavioral Health, and he was then taken back to PIW and admitted involuntarily. *Id.* ¶¶ 408–11. John Doe #2 again felt at risk of harm and witnessed violence. *Id.* ¶¶ 414–15. On one occasion, a PIW staff member directed racially offensive language at John Doe #2. *Id.* ¶ 416. John Doe #2 was also administered approximately six or seven different medications, none of which he had any experience with before. *Id.* ¶ 417. He was not offered any meaningful one-on-one therapy or opportunity to go outside or exercise. *Id.* ¶¶ 418–19. After his discharge, John Doe #2 suffered regular anxiety attacks and had difficulty coping with the traumatic experiences at PIW. *Id.* ¶ 421.

The five plaintiffs together filed this suit against PIW, as well as UHSI, a holding company with subsidiaries that own and operate healthcare facilities, and UHSD, the subsidiary of UHSI that manages and operates PIW. ECF No. 22 ¶¶ 1–2, 29–32; ECF No. 31-2 ¶ 4. The plaintiffs assert claims for disability discrimination under the ADA, Rehabilitation Act, and DCHRA; source-of-income discrimination under the DCHRA; violation of the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution under 42 U.S.C. § 1983; unfair and deceptive trade practices under the CPPA; false imprisonment; intentional infliction of emotional distress; negligence per se; and negligence. ECF No. 22 ¶¶ 432–580. The plaintiffs seek damages and injunctive relief on behalf of a putative class of individuals who have been admitted to PIW's inpatient facility. *Id.*

¶ 423. Defendant UHSI moves to dismiss all claims for lack of personal jurisdiction. ECF No. 31. Defendants UHSD and PIW move to dismiss for lack of subject matter jurisdiction and failure to state a claim. ECF Nos. 30, 32.

## II. Discussion

To survive dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the plaintiff must show the court has subject matter jurisdiction to hear their claims. *See Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008). That includes pleading facts that demonstrate the plaintiff has standing to bring the asserted claims. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "Setting 'mere conclusory statements' aside, the complaint must contain 'sufficient factual matter, accepted as true,' to support an inference of standing 'that is plausible on its face.'" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

To survive a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff must establish "a factual basis for the exercise of personal jurisdiction over the defendant." *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990). The plaintiff "must allege specific acts connecting the defendant with the forum" rather than rely on a "bare allegation" of jurisdiction. *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (alterations omitted).

To survive dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The court "must take all the factual allegations in the complaint as true," though it is "not bound to

accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

**A. The Court Lacks Personal Jurisdiction Over UHSI**

UHSI moves to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). ECF No. 31. To survive dismissal under Rule 12(b)(2), the plaintiff must make "a *prima facie* showing of the pertinent jurisdictional facts." *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988). The D.C. Circuit has instructed that "[c]onclusory statements" are not enough. *Id.* "[T]o establish a prima facie case, plaintiffs are not limited to evidence that meets the standards of admissibility." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). "Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.* The court resolves all "factual discrepancies appearing in the record" in favor of the plaintiff. *Crane*, 894 F.2d at 456.

The Supreme Court has generally recognized two ways a court has personal jurisdiction over a party: general jurisdiction—where the defendant is "essentially at home" and the court can hear "any and all claims" against them—and specific jurisdiction—which can be exercised over a party "less intimately connected" with the jurisdiction if there is "an affiliation between the forum and the underlying controversy." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–59 (2021). The plaintiffs do not argue that the court has general jurisdiction over UHSI. To the contrary, they allege UHSI is incorporated in Delaware and has its principal place of business in Pennsylvania. ECF No. 22 ¶ 29; *see Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (explaining that the "paradigm bases for general jurisdiction" with respect to a corporation are "the place of incorporation and principal place of business" (cleaned up)). But the parties dispute whether the court has specific jurisdiction over UHSI.

To establish specific jurisdiction "a court must engage in a two-part inquiry: A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). Relevant here, D.C.'s long-arm statute allows specific jurisdiction over a claim arising from the defendant:

> (1) transacting any business in the District of Columbia;
>
> . . .
>
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [or]
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he [i] regularly does or solicits business, [ii] engages in any other persistent course of conduct, or [iii] derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."

D.C. Code § 13-423(a). "Even when the literal terms of the long-arm statute have been satisfied, a plaintiff must still show that the exercise of personal jurisdiction is within the permissible bounds of the Due Process Clause." *GTE New Media Servs. Inc.*, 199 F.3d at 1347. That requires the plaintiff to "show 'minimum contacts' between the defendant and the forum establishing that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The plaintiffs assert there is personal jurisdiction under subsections (a)(1), (2), and (3) of D.C.'s long-arm statute. *See* ECF No. 33 at 5–6. The plaintiffs do not offer any argument specific to subsection (a)(3), which requires some action in D.C. And there is no indication UHSI has caused any tortious injury "by an act or omission in the District of Columbia." D.C. Code § 13-423(a)(3). As the plaintiffs allege, UHSI is a Delaware corporation with its principal place of

business in Pennsylvania. ECF No. 22 ¶ 29. UHSI supports its motion with a sworn affidavit, which indicates it is not registered to do business in D.C. and does not maintain an office here. ECF No. 31-2 ¶ 9.

The plaintiffs instead focus on subsection (a)(4), which authorizes jurisdiction over a defendant who has committed acts or omissions outside of D.C. if the defendant has one of the three enumerated contacts with the district—that is, the defendant regularly does or solicits business, engages in a persistent course of conduct, or derives substantial revenue from goods or services in D.C. D.C. Code § 13-423(a)(4). The plaintiffs rely mostly on statements pulled from written materials like corporate filings, websites, policies, and agreements. *See* ECF No. 33 at 7–20. But none show UHSI engaging in the enumerated activities in D.C. To the contrary, the record shows UHSI is a holding company, with subsidiaries that own and operate facilities in various places. ECF No. 31-2 ¶ 4. Indeed, the plaintiffs' own sources reinforce that UHSI is a holding company that operates only through its subsidiaries. *See, e.g.*, ECF No. 38-2 at 2, 6 (UHSI website indicating that UHSI is a holding company that operates healthcare facilities "through its subsidiaries" and that "[a]ll healthcare and management operations are conducted by subsidiaries of [UHSI]"); ECF No. 38-3 at 5 (employment webpage indicating that "[a]ny reference to employment at UHS or employees of UHS refers to employment with one of the subsidiaries of [UHSI]"); ECF No. 22-2 at 4–5 (Code of Conduct stating that it "provides expectations and guidance for everyone at UHS" and explaining that "'UHS' or 'UHS facilities' in this document relates to the healthcare or management operations of Universal Health Services' subsidiaries"). UHSI does not have employees, does not provide healthcare services, and is not involved in the day-to-day operations of or patient treatment at PIW or any other facility in D.C. ECF No. 31-2 ¶¶ 8, 11, 13. UHSI does not dictate staffing at PIW or have any involvement in the hiring, training,

or supervision of PIW's employees. *Id.* ¶ 15. The evidence therefore shows that any regular business conducted in or revenue earned from D.C. is done only indirectly through UHSI's subsidiaries, which is insufficient to satisfy the requirements of subsection (a)(4). *See Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 52 (D.D.C. 2018) (concluding no personal jurisdiction under subsection (a)(4) because, "[a]s a holding company, to the extent [the defendant] earns any revenue from the District, it does so only indirectly through the shares it holds in the subsidiary that owns and operates the District's . . . stores").

For largely the same reasons, the plaintiffs also do not make a showing of personal jurisdiction under subsection (a)(1), which authorizes jurisdiction over a defendant who transacts business in D.C. D.C. Code § 13-423(a)(1). As explained above, the plaintiffs have not provided any evidence to overcome the defendants' showing that UHSI is a holding company that does not have any employees, does not provide any healthcare services, is not registered to do business in D.C., and does not maintain an office here. ECF No. 31-2 ¶¶ 8, 9, 11. Simply put, the plaintiffs have not shown that UHSI transacted any business in D.C. And even if the statutory requirements were met, the court would have difficulty concluding that exercising personal jurisdiction over UHSI comports with due process given UHSI's lack of minimum contacts with D.C. *See GTE New Media Servs. Inc.*, 199 F.3d at 1347 (explaining that that "the defendant's conduct and connection with the forum State" much be "such that he should reasonably anticipate being haled into court there").

The plaintiffs alternatively argue the court has personal jurisdiction over UHSI because UHSD operates in D.C. as UHSI's agent or "alter ego." ECF No. 33 at 20–23. But, while it is true personal jurisdiction may be asserted "over a principal based on the activities of an agent," courts have recognized that "all corporations must necessarily act through agents," and therefore, a

subsidiary's contacts are imputed to a parent only when the subsidiary's activities are "of such a character as to amount to doing business of the parent." *Khatib v. All. Bankshares Corp.*, 846 F. Supp. 2d 18, 32 (D.D.C. 2012) (quoting *Gonzalez v. Internacional De Elevadores, S.A.*, 891 A.2d 227, 239 (D.C. 2006); *Curtis Publ'g Co. v. Cassel*, 302 F.2d 132, 137 (10th Cir. 1962)). That requires a plaintiff to show "the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a representative perform them, the corporation's own officials would undertake to perform substantially similar services." *Id.* Here, the record does not show UHSD is "performing a function that" UHSI "would otherwise have to perform itself." *Id.* at 33 ("Courts are in agreement that, as a general rule, it is generally improper to impute the contacts of a subsidiary to a corporate parent that is a holding company because the subsidiary is not performing a function that the parent would otherwise have to perform itself (the holding company could simply hold another type of subsidiary)." (quotation marks omitted)). The plaintiffs' cursory invocation of the alter ego theory also fails, as the plaintiffs have not met the heavy burden needed to show that UHSD is UHSI's alter ego. *See id.* at 31 (concluding that when a plaintiff "has failed to satisfy the lesser standard under the 'agency' exception . . . it follows that [the plaintiff] has also failed to meet the standard required to invoke the 'alter ego' exception"). The court therefore grants UHSI's motion to dismiss for lack of personal jurisdiction.[2]

---

[2] The plaintiffs alternatively argue that they should be afforded jurisdictional discovery. ECF No. 33 at 25–27. But "in order to get jurisdictional discovery a plaintiff must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1090 (D.C. Cir. 1998). "A district court acts well within its discretion to deny discovery when no facts additional discovery could produce would affect the jurisdictional analysis." *Lewis v. Mutond*, 62 F.4th 587, 595 (D.C. Cir. 2023) (cleaned up). The plaintiffs state that they would seek information regarding topics such as "UHSI's historical revenue generated in the District of Columbia," "[t]he

**B. John Doe #1's Claims With A One-Year Statute Of Limitations Are Time-Barred, But The Rest Of The Plaintiffs' Claims Are Not**

The remaining defendants—PIW and UHSD—argue the plaintiffs' individual and class claims are time-barred, and the court agrees as to some claims. *See* ECF No. 30-1 at 32–34; ECF No. 32-1 at 9.

The parties appear to agree the DCHRA and false imprisonment claims must be brought within one year, and the Rehabilitation Act, ADA, § 1983, CPPA, and negligence per se claims must be brought within three years. *See* ECF No. 30-1 at 33–34; ECF No. 35 at 39–40. Golden, Jane Doe #1, and John Doe #2 filed their claims within one year of being at PIW, satisfying both limitation periods. *See* ECF No. 22 ¶¶ 173, 226, 390–92. Jane Doe #2 was admitted to PIW around September 2021, but she was 13 years old at the time and her claims were tolled until the age of 18, making her claims timely too. *See* ECF No. 22 ¶¶ 302, 307; D.C. Code § 12-302(a).

John Doe #1 alleges he was at PIW more than one year but less than three years before suit, so his DCHRA and false imprisonment claims are untimely and must be dismissed. *See* ECF No. 22 ¶¶ 356–57, 382–83. The defendants argue the statute of limitations for the plaintiffs' intentional infliction of emotional distress claim is one year because it is "intertwined" with their false imprisonment claim. *See* ECF No. 30-1 at 32 n.16; *Rendall-Speranza v. Nassim*, 107 F.3d 913, 920 (D.C. Cir. 1997) (explaining that "a claim for emotional distress that is intertwined with any of the causes of action for which a period of limitation is specifically provided . . . is subject

type and nature of UHSI's services performed in the District of Columbia," and "UHSI's employees and agents working in the District of Columbia and the nature of work performed." ECF No. 33 at 26–27. But, for the reasons explained, there is no ambiguity that UHSI is merely a holding company that has no employees and does not provide healthcare services. *See* ECF No. 31-2 ¶¶ 4, 8, 11. And none of the discovery the plaintiffs seek to propound relates to the specific events and injuries alleged such that they might be able to show that their claims arise out of UHSI's contacts with D.C. Accordingly, the court denies the plaintiffs' request for jurisdictional discovery.

to the limitation period for the intertwined claim" (quotation marks omitted) (quoting *Saunders v. Nemati*, 580 A.2d 660, 664–65 (D.C. 1990)). But the plaintiffs' intentional infliction of emotional distress claim is premised not just on prolonged and unlawful commitments, but also failure to provide proper supervision, disregard for patient care standards, lack of safe and sanitary conditions, and falsification of patient records. *See* ECF No. 22 ¶¶ 542–48. The court therefore declines to dismiss John Doe #1's intentional infliction of emotional distress claim at this stage.

The defendants also contend the putative class is overbroad because it includes time-barred claims. *See* ECF No. 30-1 at 33. But as the plaintiffs explain, the putative class definition is intended to cover putative class members whose claims would be tolled until they turn 18 years old and therefore would not be time-barred. *See* ECF No. 35 at 39–40. Accordingly, the court concludes it is premature to dismiss any class claims at this stage. *See Smith v. Wash. Post Co.*, 962 F. Supp. 2d 79, 90–91 (D.D.C. 2013) (explaining that courts "rarely grant motions to dismiss or strike class allegations before there is a chance for discovery" and when the "complaint states a plausible claim for class-wide relief").

### C. The Plaintiffs Did Not Have To Give Notice Before Bringing Their State Law Claims

The defendants argue that the plaintiffs' state law claims must be dismissed because the plaintiffs did not give notice before suit, as required by D.C.'s Medical Malpractice Proceedings Act ("MMPA"). *See* D.C. Code § 16-2802(a) ("Any person who intends to file an action in the court alleging medical malpractice against a healthcare provider shall notify the intended defendant of his or her action not less than 90 days prior to filing the action."); *id.* § 16-2802(c) ("A legal action alleging medical malpractice shall not be commenced in the court unless the requirements of this section have been satisfied."). But the MMPA applies only to claims "alleging

medical malpractice," and the plaintiffs plausibly allege claims that go beyond medical malpractice.

The MMPA does not define "medical malpractice," but the core of a medical malpractice claim is a deviation from the medical standard of care—"the course of action that a reasonably prudent professional with the defendant's specialty would have taken under the same or similar circumstances." *Washington v. Wash. Hosp. Ctr.*, 579 A.2d 177, 181 (D.C. 1990) (alteration omitted) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984)); *see id*. (recognizing that a medical malpractice claim under D.C. law requires proof of: "(1) the applicable standard of care; (2) a deviation from that standard by the defendant; and (3) a causal relationship between that deviation and the plaintiff's injury"); *see also Malpractice*, Black's Law Dictionary (12th ed. 2024) (defining "medical malpractice" as a "doctor's failure to exercise the degree of care and skill that a physician or surgeon of the same medical specialty would use under similar circumstances"). The D.C. Court of Appeals has distinguished medical malpractice claims from those that do not "pertain to the quality of the medical service provided." *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1007, 1009 (D.C. 2020) (explaining that "unlike those pursuing a medical malpractice claim, claimants under the CPPA need not prove a doctor/hospital-patient relationship giving rise to a duty of care, the strictures of an applicable standard of care, violation of that standard of care, causation, or injury").

The MMPA's notice requirement therefore does not require notice of claims that don't allege deviation from the medical standard of care. *See Smith v. Corr. Corp. of Am.*, 674 F. Supp. 2d 201, 208 (D.D.C. 2009) (holding that the MMPA's notice requirement did not apply to a wrongful death claim); *Jideani v. Georgetown Univ. Hosp.*, 2019 D.C. Super. LEXIS 301, at *1, 5 (D.C. Super. Ct. Apr. 15, 2019) (holding that plaintiff "does not allege a claim for medical

malpractice, and thus is not required to provide statutory notice to the defendant" when she brought claims for false arrest, false accusation, malicious prosecution, and personal injury and alleged that she was "subjected to an unsafe, hostile and harassing environment" in a hospital); *Jones v. Brinton Woods Rehab Facility*, 2018 D.C. Super. LEXIS 428, at *2–3 (D.C. Super. Ct. June 8, 2018) (holding that "Plaintiff is not required to send Defendant a 90-day notice under the MMPA" because "Plaintiff makes clear that this is not a case of medical malpractice but rather a case for personal injury" arising from "Defendant's conduct in providing care to Plaintiff while residing in the nursing home"). Many of the plaintiffs' state law claims, including those for disability discrimination under the DCHRA, violations of the CPPA, intentional infliction of emotional distress, and false imprisonment, clearly do not involve allegations of a deviation from the medical standard of care and therefore are not subject to the notice requirement.

The plaintiffs' negligence and negligence per se claims pose a closer question. To be sure, these claims involve similar elements to a claim for medical malpractice, and some allegations in the complaint appear to sound in medical malpractice. *See, e.g.*, ECF No. 22 ¶ 553 (alleging that the defendants failed to provide "adequate medical care, group or individual therapy, psychiatric medication, resources relating to mental or emotional health, resources related to bodily health, opportunities for exercise or fresh air, as would be required in accordance with an appropriate psychiatric care and medical/mental health treatment plan"); *id.* ¶ 564 (alleging that the defendants failed "to provide minimally adequate medical and psychiatric care and treatment" and admitted "patients when they were not mentally ill, not likely to injure themselves or others, or when hospitalization was not the least restrictive form of treatment available"); *id.* ¶ 569 (alleging the defendants had a duty to act with reasonable care "in the Plaintiffs' and the putative Class Members' supervision, treatment, and care"). And, as the defendants point out, the plaintiffs'

amended complaint removes references to the "medical standard of care" and other allegations that sound in medical malpractice. *See* ECF No. 30-1 at 14–16; ECF No. 22-1 ¶¶ 259, 274, 290, 512 (removing allegations that defendants violated the "medical standard of care"); *id.* ¶ 576 (removing allegation that the defendants "failed to provide adequate mental health treatment and individualized treatment plans"). But despite certain similarities to a medical malpractice claim, the court concludes that, as pled, the plaintiffs' negligence and negligence per se claims concern a breach of more general professional and statutory standards about the administration, operation, and staffing of PIW's business. *See* ECF No. 22 ¶¶ 553, 564 (alleging that the defendants were negligent per se by, among other things, failing to permit adequate and free communication with others, failing to provide resources related to mental or emotional health, failing to provide adequate resources to patients to challenge their civil commitments, and failing to keep accurate records detailing all medical and psychiatric care and treatment received by admitted persons); *id.* ¶¶ 576–79 (alleging that the defendants were negligent by failing to provide patients with dignity and respect, admitting more patients than could safely be supervised and failing to employ an adequate number of staff members, subjecting the plaintiffs to unsafe and unsanitary conditions, and falsifying treatment records or otherwise committing and prolonging the commitment of the plaintiffs under false pretenses).

To the extent the plaintiffs' claims ultimately turn on a medical standard of care, they may be appropriately dismissed for lack of notice. But as pled, the plaintiffs' claims challenge systemic failures and company-wide policies about conditions at PIW that make this case unlike those in which plaintiffs tried "recasting the nature of" a suit "based on [the defendants'] professional medical services" to get around the MMPA. *Diffenderfer v. United States*, 656 F. Supp. 2d 137, 140 (D.D.C. 2009) (rejecting plaintiff's attempt to recast a suit about medical judgment in

"compounding and dispensing the Trypan Blue solution used in [his] surgery" as product liability rather than malpractice).

**D. The Plaintiffs Plausibly Allege Disability Discrimination Claims Under The ADA And DCHRA Against Both UHSD And PIW, And Under The Rehabilitation Act Against UHSD**

The plaintiffs assert that the defendants violated Section 504 of the Rehabilitation Act, Title III of the ADA, and the DCHRA, each of which protects individuals from discrimination based on disability. *See* 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."); 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); D.C. Code § 2-1402.31(a)(1) (making it "an unlawful discriminatory practice" to "deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" "wholly or partially for a discriminatory reason based on the actual or perceived . . . disability . . . of any individual").

The plaintiffs assert all three claims against UHSD and PIW, but they have not plausibly alleged a Rehabilitation Act claim against PIW. Section 504 of the Rehabilitation Act applies only to a "program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *see also U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986) (recognizing section 504 is limited to "those who actually 'receive' federal financial assistance" because Congress "sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds"). Here, the plaintiffs allege that "UHS, Inc. and UHS Delaware receive federal and

state government funding in the form of procurement and grants" but do not similarly allege that PIW receives such subsidies. ECF No. 22 ¶ 60. The plaintiffs respond that "one can reasonably infer from the allegations in the Amended Complaint that PIW accepts Medicare and Medicaid patients," but the complaint's mentions of Medicare and Medicaid are too general to support that inference. ECF No. 34 at 25; *see* ECF No. 22 ¶¶ 82, 114; *Iqbal*, 556 U.S. at 678 (explaining that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim). The court accordingly dismisses the plaintiffs' Rehabilitation Act claim against PIW.

The court otherwise concludes the defendants have stated disability discrimination claims under these statutes, at least in part. To state a claim under the statutes, a plaintiff must plausibly allege: (1) they are disabled within the meaning of the statutes; (2) they are otherwise qualified; and (3) they were excluded from, denied the benefit of, or subject to discrimination under a program or activity by reason of their disability. *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008); *Wheeler v. Am. Univ.*, 619 F. Supp. 3d 1, 18 (D.D.C. 2022). ADA and DCHRA claims "are subject to the same standards," so their analyses merge. *Wheeler*, 619 F. Supp. 3d at 18. The Rehabilitation Act is "virtually identical," *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999), but requires "more stringent" causation—instead of showing disability "was 'a motivating factor in the alleged discrimination,'" a plaintiff must show she was "discriminated against 'solely' by reason of her disability," *Jones ex rel. A.H. v. District of Columbia*, 805 F. Supp. 3d 218, 243 (D.D.C. 2025) (quoting *Reid-Witt ex rel. C.W. v. District of Columbia*, 486 F. Supp. 3d 1, 11 (D.D.C. 2020)).

The plaintiffs, who were each admitted for inpatient psychiatric treatment, plausibly allege they are disabled within the meaning of the statutes. *See Wheeler*, 619 F. Supp. 3d at 19

(concluding that the plaintiff "is a qualified individual under all three statutes because she has diagnoses of major depressive disorder, anxiety, and possibly bipolar disorder" and "[t]hose disabilities have substantially limited her major life activities—namely learning, concentrating, and thinking—as reflected by her suicidal ideations"). PIW argues Jane Doe #1 is not disabled within the meaning of the statute because the complaint alleges she "had never been diagnosed with borderline personality disorder" or "adjustment disorder." ECF No. 22 ¶¶ 235, 249; *see* ECF No. 32-1 at 15. But the statutes define "disability" to include someone "perceived" as disabled or otherwise "regarded" as having a physical or mental impairment, and Jane Doe #1 has plausibly alleged that. 42 U.S.C. § 12102(1)(C), (3); 29 U.S.C. § 705(20)(B); D.C. Code §§ 2-1402.31, 2-1431.01(4); *see* ECF No. 22 ¶¶ 256, 268, 270.

The plaintiffs offer two theories of exclusion or denial of benefits based on their disability; the court finds they have plausibly alleged the first but not the second.

The plaintiffs' first theory is that the defendants denied them the benefit of receiving "mental health treatment in an environment that is safe, sanitary, and humane" because they were more acutely disabled than PIW patients with less severe mental health disabilities, who were provided with various programs and services in PIW's outpatient programs. ECF No. 22 ¶¶ 440–42, 455, 496. The complaint specifically alleges a "benefit" that the plaintiffs were denied: the provision of behavioral health services, which were afforded to those in outpatient programs but not to those in inpatient programs. ECF No. 35 at 17. In particular, it alleges that the plaintiffs were denied "individualized treatment plans, efficacious one-on-one and group therapy, therapeutic modalities, social work resources, diagnostic services and assessments, and treatment with compassion, and dignity in a safe, clean and therapeutic environment." ECF No. 22 ¶¶ 455, 496; *see also Andrews v. Rauner*, No. 3:18-cv-1101, 2018 WL 3748401, at *5 (C.D. Ill. Aug. 6,

2018) (concluding that the plaintiff stated a disability discrimination claim where she alleged that she "was denied a long list of activities, programs, and services, including education, programming, recreation, exercise, and mental health treatment and services").

The defendants' arguments to the contrary are unpersuasive. First, they assert that the plaintiffs' claims are not cognizable under the statutes because they allege substandard medical care. ECF No. 30-1 at 20–21; ECF No. 32-1 at 10. To the extent the plaintiffs' claims are based on disagreement with the defendants' treatment decisions, they may not state a claim for disability discrimination. *See, e.g.*, *United States v. Univ. Hosp.*, 729 F.2d 144, 156 (2d Cir. 1984) (reasoning that the Rehabilitation Act prohibits "discrimination against a handicapped individual only where the individual's handicap is unrelated to, and thus improper to consideration of, the services in question"); *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."), *overruled in part on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc). But "a plaintiff pleads an actionable claim of discrimination in the medical treatment context under the ADA or the Rehabilitation Act if she alleges that the defendants made treatment decisions based on factors that are 'unrelated to, and thus improper to consideration of' the inquiry in question." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 234 (2d Cir. 2014). Here, the plaintiffs have not merely alleged inadequate medical treatment; they have alleged that the defendants discriminated against them by denying them access to various mental health treatment programs while allowing patients with less severe mental health disabilities to take part in those programs. ECF No. 22 ¶¶ 11, 441, 454–55, 496. This is sufficient to plausibly allege that they were excluded from or denied the benefit of a program or activity by reason of their disabilities.

The defendants, second, argue the plaintiffs must show they faced discrimination compared to non-disabled people, not compared to different groups of disabled people. ECF No. 30-1 at 22–23; ECF No. 32-1 at 11–12. But courts have held that plaintiffs may state a claim for disability discrimination by showing they were treated differently than other groups of disabled individuals. *Amundson ex rel. Amundson v. Wisc. Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) (explaining that individuals with disabilities can establish "intra-class claims of discrimination" by showing that "they are being treated worse than persons with other disabilities"); *Messier v. Southbury Training Sch.*, 916 F. Supp. 133, 141 (D. Conn. 1996) (collecting cases in which courts have "recognized that both Section 504 and the ADA prohibit discrimination on the basis of the severity of a person's disability").

And the defendants, third, argue the plaintiffs have not plausibly alleged the denial of access to mental health treatment programs was "caused" by the plaintiffs' disability because they also allege that the discrimination was caused by the defendants' desire for financial gain. *See* ECF No. 30-1 at 21–22; ECF No. 32-1 at 10–11; ECF No. 37 at 12–14. But even the Rehabilitation Act's more stringent causation standard—which requires discrimination "solely" based on the plaintiffs' disabilities—requires only that disability be a "but-for" cause. *See Drasek v. Burwell*, 121 F. Supp. 3d 143, 154 (D.D.C. 2015); *Iyer v. George Washington Univ. Sch. of Med. & Health Scis.*, No. 24-cv-130, 2025 WL 2192985, at *8 (D.D.C. Aug. 1, 2025) ("Courts in this District routinely apply but-for causation in Rehabilitation Act cases." (collecting cases)). Drawing all reasonable inferences in the plaintiffs' favor, the court concludes that they have plausibly alleged that they would not be denied the benefit of mental health treatment programs absent their disabilities. *See* ECF No. 22 ¶¶ 129, 161, 445. It may well be the defendants made decisions for financial gain and yet their perceptions about the plaintiffs' disabilities were but-for causes of the

alleged discrimination. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 n.5 (2d Cir. 2013) (explaining that "a plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability").

The plaintiffs' second theory does not fare as well. According to the plaintiffs, they have also plausibly alleged exclusion or denial of benefits under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), because the defendants unjustifiably isolated them and failed to provide services in the "most integrated setting." ECF No. 35 at 19; *see also* ECF No. 22 ¶¶ 444, 455, 496. In particular, the plaintiffs say the defendants "prolonged" their inpatient civil commitments "when intensive community-based services or other appropriate outpatient services would have been more appropriate to their needs." ECF No. 22 ¶ 444.

In *Olmstead*, the Supreme Court concluded that "unjustified institutional isolation of persons with disabilities is a form of discrimination." 527 U.S. at 600. The court explained that entities subject to the ADA must administer programs and activities in the "most integrated setting appropriate to the needs of" qualified persons. *Id.* at 591–92; *see Brown v. District of Columbia*, 928 F.3d 1070, 1077 n.6 (D.C. Cir. 2019) (explaining that, while "*Olmstead* dealt specifically with the ADA," its analysis "applies equally to the Rehabilitation Act"). The "most integrated setting appropriate" means "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Olmstead*, 527 U.S. at 592 (quoting 28 C.F.R. pt. 35, app. A, p. 450 (1998)). Accordingly, the ADA and Rehabilitation Act "require placement of persons with mental disabilities in community settings rather than in institutions" under certain circumstances. *Id.* at 587. Specifically, such "action is in order when the State's treatment professionals have determined that community placement is appropriate, the transfer from

institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated." *Id.*

Here, although the plaintiffs assert that their commitments were "prolonged," they have not plausibly alleged "treatment professionals have determined that community placement is appropriate." *Id.*; *see also Disability Rts. Cal. v. County of Alameda*, No. 20-cv-05256, 2021 WL 212900, at *10 (N.D. Cal. Jan. 21, 2021) (concluding plaintiff did not state disability discrimination claim based on allegations that private entity operating a psychiatric hospital holds constituents "longer than clinically appropriate" and "needlessly extends stays" because the plaintiff did "not specifically allege that [the entity's] 'treatment professionals' have determined that community-based treatment would be more appropriate for patients subject to these stays"); *cf. S.C. v. County of Los Angeles*, No. 21-cv-6163, 2023 WL 10407140, at *25 (C.D. Cal. Aug. 11, 2023) (concluding that plaintiff stated a disability discrimination claim against a private hospital where "a medical professional did determine that Plaintiff was medically ready for discharge to" a facility that was plausibly "a more integrated setting than a psychiatric hospital"). To the contrary, the plaintiffs allege their discharges were not a result of any determination that discharge was warranted by a "treatment professional"—in fact, several of the plaintiffs allege that their discharges were "against medical advice." *See* ECF No. 22 ¶ 197 (alleging that "Mr. Golden signed paperwork indicating that he would be discharged 'against medical advice'"); *id.* ¶ 280 (alleging that only *after* "Ms. Doe #1 was ordered to be discharged by the D.C. Superior Court, Dr. Ganjoo and PIW drastically changed their assessment of Ms. Doe #1"), *id.* ¶ 346–47 (alleging that Jane Doe #2 was discharged "against medical advice" due "to the efforts of" her mother), *id.* ¶ 382–83 (alleging that John Doe #1 "asked to be discharged immediately" and was discharged as a result of his "constant urging and advocacy"), *id.* ¶ 405–13

(alleging that John Doe #2 was discharged "against medical advice" on his first visit to PIW and was "eventually discharged" from PIW on his second visit). The plaintiffs accordingly do not state a claim of unjustified isolation under *Olmstead*.

### E. The Plaintiffs Plausibly Allege A DCHRA Claim For Discrimination Based On Source of Income

The DCHRA prohibits discrimination based on a person's "actual or perceived . . . source of income." D.C. Code § 2-1402.31(a). The DCHRA defines "source of income" as:

> the point, the cause, or the form of the origination, or transmittal of gains of property accruing to a person in a stated period of time; including, but not limited to, money and property secured from any occupation, profession or activity, from any contract, agreement or settlement, from federal or District payments, court-ordered payments, from payments received as gifts, bequests, annuities, life insurance policies and compensation for illness or injury.

D.C. Code § 2-1401.02(29). The D.C. Court of Appeals has recognized that this "capacious formulation" is intended "to have a significant reach." *Blodgett v. Univ. Club*, 930 A.2d 210, 220–21 (D.C. 2007).

The plaintiffs allege the defendants discriminated against them "based on the source of payment for their care" by "disproportionately subjecting individuals with private health insurance coverage to unnecessary involuntary hospitalization and/or prolonging their hospitalization until such time as insurance funds ran out, when outpatient/community-based treatment programs would have been more appropriate or otherwise indicated for their needs." ECF No. 22 ¶ 497. "Although the District of Columbia Court of Appeals has not yet 'outlined the boundaries of source-of-income discrimination under the Human Rights Act,'" the court concludes that discrimination on the basis of whether a patient has private insurance falls within the statute's definition of source of income. *See Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063, 1070 (D.C. Cir. 2008) (landlord's refusal to accept vouchers from the Section 8 rental assistance program for

payment of plaintiffs' rent qualified as "source of income" discrimination); *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 383 (D.D.C. 2020) (policy requiring that patients and partners both be financially responsible for their fertility treatments qualified as "source of income" discrimination). The plaintiffs have alleged sufficient facts for the court to infer that the defendants in some cases discriminated against patients based on the type of insurance they had. *See* ECF No. 22 ¶ 72 (alleging UHSD's chief financial officer acknowledged corporate strategy of "simply admitting patients whose insurance will pay us more" during an earnings call); *id.* ¶¶ 258–61 (alleging PIW falsified records of Jane Doe #1 to prolong her commitment and recover a maximum amount of revenue from her health insurance carrier).

### F. The Plaintiffs Plausibly Allege PIW Violated The Fifth Amendment, But Their Fourth and Fourteenth Amendment Claims Must Be Dismissed

The plaintiffs assert that the defendants violated their Fourth Amendment rights by involuntarily admitting them when they were not mentally ill and subjecting them to prolonged detention without probable cause to believe they were likely to injure themselves or others and when less restrictive treatment was available. *Id.* ¶ 477. And the plaintiffs assert the defendants violated the Fifth and Fourteenth Amendments by not providing minimally adequate and timely medical treatment and protection from physical harm, restricting their liberty through inappropriate use of chemical restraints, confining them in unsanitary and inhumane conditions, and not providing adequate notice and resources to challenge civil commitments. *Id.* ¶ 485. They bring these claims under 42 U.S.C. § 1983, which provides a cause of action against a person who, "under color of" state law, "causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." The requirement that the defendant act "under color of" state law "has consistently been treated as the same thing as the 'state action' required under the Fourteenth

Amendment." *Rendell–Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quoting *United States v. Price*, 383 U.S. 787, 794 n.7 (1966)).

The plaintiffs' Fourth and Fourteenth Amendment claims must be dismissed. As to the Fourth Amendment, PIW argues—and the plaintiffs do not dispute—that the plaintiffs' involuntary admission was supported by probable cause to believe that they were a danger to themselves. ECF No. 32-1 at 18–19; *see* ECF No. 34 at 36; *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003) ("A warrantless seizure for the purpose of involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others."); *Fox v. Am. Airlines, Inc.*, No. 02-cv-2069, 2003 WL 21854800, at *2 (D.D.C. Aug. 5, 2003) (explaining that, "when a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded"), *aff'd*, 389 F.3d 1291 (D.C. Cir. 2004). And the Fourteenth Amendment's due process clause does not apply to the District of Columbia and therefore does not apply to entities acting "under color of" D.C. law. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954).

But the plaintiffs do plausibly allege a Fifth Amendment claim against PIW. The Supreme Court has recognized that "a private entity can qualify as a state actor in a few limited circumstances." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019). This includes: "(i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Id.* (citations omitted). The state action analysis is a "necessarily fact-bound inquiry." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). And "state action may be found if, though only if, there is such a 'close nexus between the State

and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

Here, the plaintiffs have plausibly alleged PIW is a state actor under the third avenue—that it acts jointly with the District in providing inpatient psychiatric care to patients referred by the District for involuntary admission. Private conduct may be attributed to the state when "the activities of the government and the entity in question are so intertwined that a 'symbiotic relationship' exists between them." *Foster v. Ripley*, 645 F.2d 1142, 1146 (D.C. Cir. 1981) (quoting *Jackson*, 419 U.S. at 357); *see Jackson*, 419 U.S. at 357–58 (describing a situation when the state had "so far insinuated itself into a position of interdependence with the [private actor] that it was a joint participant in the" challenged activity). Similarly, a private actor may be deemed a state actor "when it is 'entwined with governmental policies,' or when government is 'entwined in its management or control.'" *Brentwood Acad.*, 531 U.S. at 296 (alteration omitted) (quoting *Evans v. Newton*, 382 U.S. 296, 299, 301 (1966)). That said, acts of private entities with government contracts "do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell-Baker*, 457 U.S. at 841. Nor does the fact that a private entity is subject to extensive state regulation make the entity a state actor. *Id.* Rather, a private entity can be considered a state actor "only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

Here, the plaintiffs have plausibly alleged that PIW is so intertwined with the District when admitting and caring for patients referred by the District that it qualifies as a state actor when providing such services. Under a contract with the District, PIW is obligated to provide inpatient

psychiatric care and treatment services to patients referred for involuntary commitment by the District. *See* ECF No. 22 ¶¶ 107–08. The District initiates the involuntary commitment process with a form FD-12, which is used when there is reason to believe that a person is mentally ill and is likely to injure self or others if not immediately detained. *Id.* ¶¶ 116–18. PIW receives a considerable number of its patients through the FD-12 process and admits the majority of FD-12 patients in the District. *Id.* ¶ 120. And PIW is not merely a recipient of funds from the district or an entity subject to the District's regulations. PIW's contract with the District requires PIW to comply with certain standards of care and protocols. ECF No. 22 ¶¶ 109–12. Additionally, the contract provides the District with oversight authority over the provision of care at PIW. ECF No. 22-3 at 10–12 (contract indicating that the District "shall oversee and monitor the provision of acute inpatient psychiatric care and treatment to patients under" the contract and the District has "access to all areas of the facility" and "patient treatment records and billing records" for patients it referred). The plaintiffs further allege that the District has conducted investigations related to training at PIW and reviewed an incident report submitted by a PIW employee. ECF No. 22 ¶¶ 159–60. Accordingly, the plaintiffs have plausibly alleged that PIW is a state actor when providing inpatient mental health services to patients pursuant to its contract with the District. *See Jensen v. Lane County*, 222 F.3d 570, 575 (9th Cir. 2000) (concluding that a contract physician affiliated with a private group who was involved in involuntary detention process was a state actor when "[c]ounty employees initiate the evaluation process, there is significant consultation with and among the various mental health professionals," and the private group "helps to develop and maintain the mental health policies of [the county facility]"); *Doe ex rel. Doe v. District of Columbia*, No. 03-cv-1789, 2005 WL 8167785, at *5 (D.D.C. June 20, 2005) (denying a motion to dismiss which argued that a private entity that contracted with the District to provide foster care

is not a state actor where the plaintiff made a "symbiotic relationship" or "entwinement" argument that "the government placed restrictions on [the entity's] operations" and "has the authority to monitor the performance of the contractor and whether or not [the entity] is complying with contract requirements"); *Schorr v. Borough of Lemoyne*, 265 F. Supp. 2d 488, 495 (M.D. Pa. 2003) (concluding private hospital is a state actor when "there is daily involvement and oversight of the county such that it has influence over the policies of the Crisis Intervention program" at the hospital, including "a variety of informal and formal periodic reviews and audits"). Here, the plaintiffs have alleged that only Jane Doe #1 and John Doe #2 were admitted to PIW through an FD-12 process with the involvement of the District. ECF No. 22 ¶¶ 232–47, 391–92, 408–11. There are no such allegations for John Doe #1 and the voluntarily admitted plaintiffs, so those plaintiffs' Fifth Amendment claim is dismissed. Moreover, the plaintiffs have not made any similar allegations to support their claim that UHSD is a state actor. The court accordingly dismisses the Fifth Amendment claim, in addition to the Fourth and Fourteenth Amendment claims, against UHSD.[3]

---

[3] The plaintiffs also argue the defendants are state actors because, by providing mental health services and civil commitment, they perform a "public function"—that is, a function that is "traditionally the *exclusive* prerogative of the State." *Rendell-Baker*, 457 U.S. at 842 (quoting *Jackson*, 419 U.S. at 353). But "providing mental health services has not been a power which has traditionally been exclusively reserved to the state." *Brown v. Hill*, No. 21-7116, 2023 WL 3563076, at *3 (D.C. Cir. May 19, 2023) (cleaned up) (affirming dismissal of a section 1983 claim against an entity that provided mental health services under contract with the District); *see also Spencer v. Lee*, 864 F.2d 1376, 1379 (7th Cir. 1989) (explaining that "[t]he treatment of the mentally disabled" is not a function that has "traditionally been the *exclusive* prerogative of government"). And courts have similarly held that civil commitment is not a public function. *See Spencer*, 864 F.2d at 1377, 1380 (analyzing history to conclude that "commitment has long been a private remedy" and therefore "a private physician and a private hospital" do not act under color of state law "when they commit a mentally disturbed person"); *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 260 (1st Cir. 1994) (explaining that "[t]he history of involuntary admission of the mentally ill to facilities for their care shows that involuntary admission is not a traditional, exclusively sovereign function" and, to the contrary, "caring for the mentally ill, including their

The court concludes that Jane Doe #1 and John Doe #2's Fifth Amendment due process claim survives in part. To start, PIW argues—and the plaintiffs do not dispute—that the complaint does not allege a procedural due process violation because the decision to commit the involuntarily admitted patients was premised on an assessment that they were "mentally ill" and "require[d] hospitalization for [their] own welfare and protection of others," *Foucha v. Louisiana*, 504 U.S. 71, 75–76 (1992), and they do not allege any physical restraint during their commitment, *Doe ex rel. Tarlow v. District of Columbia*, 920 F. Supp. 2d 112, 124–25 (D.D.C. 2013). *See* ECF No. 32-1 at 20; ECF No. 34 at 36.

But the court concludes the complaint plausibly alleges a violation of the plaintiffs' substantive due process rights. The "substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 (1989) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982)). In addition, those who are involuntarily committed must be provided with "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200. An involuntary commitment decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323.

---

involuntary confinement, has historically been a predominantly private function"); *Harvey v. Harvey*, 949 F.2d 1127, 1131 (11th Cir. 1992) (declining "to categorize involuntary commitment in Georgia as a function so reserved to the state that action under the commitment statute transforms a private actor into a state actor").

The complaint plausibly alleges that PIW denied Jane Doe #1 and John Doe #2 their basic needs and reasonable safety in a manner that departed from professional standards, in violation of the Fifth Amendment. Specifically, it alleges these two plaintiffs experienced substandard and unsanitary conditions, were given food that was not nutritious, were given medications that were not appropriate or that they had never taken before, and did not receive any individualized therapy or counseling during their time at PIW. ECF No. 22 ¶¶ 296–97, 403 (Jane Doe #1 and John Doe #2 alleging they encountered frigid showers, uncomfortably cold temperatures, and broken sinks); *id.* ¶ 277 (Jane Doe #1 alleging she was forced to take Benadryl despite her lack of any symptoms or medical condition for which Benadryl is indicated); *id.* ¶¶ 398, 417 (John Doe #2 alleging he was given psychotropic medications he had never been prescribed before); *id.* ¶¶ 286, 400 (Jane Doe #1 and John Doe #2 alleging they were not given nutritious food); *id.* ¶¶ 262–63, 278, 291, 293, 397 (Jane Doe #1 and John Doe #2 alleging they did not receive individualized therapy, treatment, or counseling). Additionally, John Doe #2 witnessed staff members and patients harm patients and was himself punched in the face by another patient during his intake process. *Id.* ¶¶ 394, 399, 404, 414–15. The plaintiffs allege that these actions and omissions were a result of PIW's policy of understaffing its inpatient facilities and failing to properly train staff. *Id.* ¶ 486; *see Grissom v. District of Columbia*, 853 F. Supp. 2d 118, 124 (D.D.C. 2012) ("[J]ust "as the District can only be held liable under § 1983 for its own actions and not under a *respondeat superior* theory, so too can [a private entity] only be held liable for constitutional violations affirmatively precipitated by its policy or practice."); *see Jordan v. District of Columbia*, 949 F. Supp. 2d 83, 90 (D.D.C. 2013) ("Many courts have adopted the 'custom or policy' requirement—which was designed for claims against a municipality—when adjudicating § 1983 claims against private entities."). Accordingly, the court concludes Jane Doe #1 and John Doe #2 state a claim

for violation of the Fifth Amendment under section 1983. *See Jordan*, 949 F. Supp. 2d at 91 (concluding that the plaintiff stated a due process claim against PIW because she alleged that "she was improperly subjected to physical restraints and seclusion," that "PIW personnel failed to properly document her medical treatment, and that its personnel never conducted a formal review of her medication plan," and that "PIW's personnel improperly forced her to take psychotropic medication").

Finally, PIW asserts an affirmative defense of qualified immunity. When a private party seeks qualified immunity the court must consider whether (1) there is a "'firmly rooted' tradition of immunity applicable" to similarly situated parties at common law, *Richardson v. McKnight*, 521 U.S. 399, 404 (1997); and (2) immunity would be consistent with "the reasons [courts] have afforded protection from suit under § 1983," *Filarsky v. Delia*, 566 U.S. 377, 384 (2012). PIW does not meaningfully engage with the first consideration. PIW argues that market incentives satisfy the second consideration, but those arguments are not supported by the pleadings. *See Jensen*, 222 F.3d at 578–80 (concluding that a physician affiliated with "a privately organized group of psychiatrists providing services to the government pursuant to contract" was not entitled to qualified immunity); *Tanner v. McMurray*, 989 F.3d 860, 872–74 (10th Cir. 2021) (concluding that a "nationwide company that is systematically organized to profit from providing medical care in detention facilities" was not entitled to qualified immunity).

### G. The Plaintiffs Plausibly Allege A D.C. Consumer Protection Procedures Act Claim

The plaintiffs assert a claim under the D.C. Consumer Protection Procedures Act, alleging the defendants made various misrepresentations about the services provided by PIW. ECF No. 22 ¶¶ 508–29.

The CPPA provides that, "whether or not any consumer is in fact misled, deceived, or damaged thereby," a person or entity may not engage in an unfair or deceptive trade practice by, among other things, "represent[ing] that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another," "misrepresent[ing] as to a material fact which has a tendency to mislead," or "fail[ing] to state a material fact if such failure tends to mislead." D.C. Code § 28-3904(d)–(e), (f). Any consumer may file suit "seeking relief from the use of a trade practice in violation of" these provisions or another "law of the District." *Id.* § 28-3905(k)(1)(A).

The plaintiffs have plausibly alleged standing to bring this claim. To establish standing to sue for a violation of the CPPA, a plaintiff must allege that they suffered a "concrete and particularized injury" that is "fairly traceable" to the challenged unlawful trade practice and "likely to be redressed by a favorable judicial decision." *Mann v. Bahi*, 251 F. Supp. 3d 112, 118–19 (D.D.C. 2017). Drawing all reasonable inferences in the plaintiffs' favor, the complaint plausibly alleges that the harms Golden and Jane Doe #2 experienced at PIW are fairly traceable to their review and reliance on PIW's marketing materials, which informed their decisions about where to be admitted. *See* ECF No. 22 ¶ 171–72 (alleging that Golden reviewed PIW's website and representations about its services "so that he could make an informed decision about his placement"); *id.* ¶¶ 306–07 (alleging that Jane Doe #2's mother reviewed PIW's website before signing paperwork agreeing to have her daughter admitted to PIW). Although PIW argues "the plaintiffs other than Golden lack standing," ECF No. 36 at 15, the court "need only find one party with standing" to proceed to the merits of the claim, *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013). Accordingly, the court has jurisdiction over the plaintiffs' CPPA claim.

The plaintiffs have plausibly alleged a claim for material misrepresentations and omissions under the CPPA as to the voluntarily admitted plaintiffs (Golden and Jane Doe #2) but not as to

the involuntarily admitted plaintiffs (Jane Doe #1, John Doe #1, and John Doe #2). To plausibly allege a misrepresentation or omission is material, the plaintiff "must merely allege facts that, if taken as true, would allow the Court plausibly to conclude that a significant number of consumers would find the information important" in determining a course of action. *Scott v. Apple Inc.*, 757 F. Supp. 3d 1, 14–15 (D.D.C. 2024). The plaintiffs have plausibly alleged that the defendants made misrepresentations about PIW's offerings that voluntarily admitted individuals would find important in determining whether to use PIW's services. *See, e.g.*, ECF No. 22 ¶ 511 (alleging the defendants represented that "patients in PIW's inpatient facilities are provided with mental health treatment components that are in fact routinely not offered or provided"); *id.* ¶ 512 (alleging the defendants represented that the admissions process includes a "clinical assessment" when in fact "patients often languish at PIW without an in-person psychiatric evaluation for many days"); *id.* ¶ 513 (alleging the defendants represented that patients "have the opportunity to meet with their treatment team to provide input and understand their individualized treatment plan" when in fact "patients are not given the chance to meet with their treatment team about their care and treatment plans are not individualized"); *id.* ¶ 519 (alleging that a "reasonable person would attach importance" to the misrepresentations or omissions). But the plaintiffs have not stated a claim for misrepresentation of a material fact as to involuntarily admitted individuals. PIW argues—and the plaintiffs do not dispute—that the complaint does not plausibly allege that involuntarily admitted individuals would find the alleged misrepresentations important because they lack choice in determining whether and where to be admitted. *See* ECF No. 32-1 at 23; ECF No. 34 at 37.[4]

---

[4] The plaintiffs also assert that their claims under the CPPA are not limited to the defendants' unfair trade practices prohibited by the act's own substantive provisions. "Although § 28-3904 makes a host of consumer trade practices unlawful, its list of such practices was not designed to be exclusive." *Atwater v. D.C. Dep't of Consumer & Regul. Affs.*, 566 A.2d 462, 466 (D.C. 1989).

### H. The Plaintiffs Plausibly Allege A Claim For False Imprisonment

The plaintiffs assert a claim for false imprisonment, alleging the defendants subjected them to commitments that were not medically necessary or that were unnecessarily prolonged based on the defendants' materially false statements in reports and records. ECF No. 22 ¶¶ 530–38.

To show false imprisonment, a plaintiff must establish: "(1) the detention or restraint of one against his will, within boundaries fixed by the defendant, and (2) the unlawfulness of the restraint." *Faniel v. Chesapeake & Potomac Tel. Co. of Md.*, 404 A.2d 147, 150 (D.C. 1979). "If a person detains another with the authority of law, he cannot be liable in tort for the reasonable exercise of that authority." *Magwood v. Giddings*, 672 A.2d 1083, 1086 (D.C. 1996). A continued detention may constitute false imprisonment where a defendant exceeds the scope of a plaintiff's initial consent. *See Faniel*, 404 A.2d at 153 (explaining that "if the defendant goes beyond the implied consent, and does a substantially different act, he will be liable"); *Dent v. May Dep't Stores Co.*, 459 A.2d 1042, 1044 (D.C. 1982) (acknowledging that "a detention which is unreasonable in length or manner could constitute a false imprisonment despite the legality of the initial confinement"); *Jones v. District of Columbia*, No. 16-cv-2405, 2019 WL 5690341, at *5 (D.D.C. June 13, 2019) (recognizing a false imprisonment claim because "the defendant refuses to release the plaintiff from confinement that began lawfully but has become unlawful over time").

Drawing all reasonable inferences in the plaintiffs' favor, the court concludes that the plaintiffs have stated a false imprisonment claim as to the voluntarily admitted plaintiffs—Golden

---

Instead, the CPPA "contemplates that its procedures will be invoked, not simply to enforce its own substantive provisions, but also those of other consumer protection laws." *Id.* Here, the plaintiffs assert that the defendants have engaged in trade practices deemed unlawful under the D.C. Mental Health Consumers' Rights Protection Act. ECF No. 22 ¶¶ 522–29. PIW does not challenge the plaintiffs' CPPA claim to the extent it is based on the D.C. Mental Health Consumers' Rights Protection Act. *See* ECF No. 36 at 15–16 (PIW stating "to the extent the CPPA claim is based on the CPPA itself (as opposed to the D.C. Mental Health Consumers Rights Protection Act), the claim should be dismissed").

and Jane Doe #2—because they have plausibly alleged that their commitments exceeded the scope of their consent in a manner that violates law. *See, e.g.*, ECF No. 22 ¶¶ 176–78 (alleging that Golden was taken to a holding cell upon arrival to PIW, where he was left alone with no food or water, and wanted to leave); *id.* ¶¶ 189–90 (alleging that Golden asked about the process for discharge the morning after he arrived and spent his first 36 hours at PIW repeatedly asking to be seen by a doctor); *id.* ¶¶ 324–30 (alleging Jane Doe #2 experienced violence and dismal living conditions at PIW); *id.* ¶¶ 346–47 (alleging that Jane Doe #2 was discharged the day after her mother filled out paperwork to have her discharged against medical advice).

As for the involuntarily committed plaintiffs, the complaint plausibly states a false imprisonment claim as to Jane Doe #1 but not as to John Doe #1 and John Doe #2. The complaint plausibly alleges—and PIW concedes—that Jane Doe #1 was involuntarily admitted to PIW based on a falsified safety risk assessment, and she therefore was not lawfully detained. *See* ECF No. 22 ¶¶ 248–58; ECF No. 36 at 17 (PIW stating that "[a]side from Jane Doe #1, Plaintiffs' false-imprisonment claim fails"); *see also id.* (PIW arguing that "the involuntarily-admitted plaintiffs must plausibly allege that their suicidality ended at some point during their detention," and "Jane Doe #1 has done so"). But John Doe #1 and John Doe #2 were both admitted involuntarily because they were having suicidal ideations, and the complaint does not plausibly allege that their mental health issues giving rise to safety concerns ended at any point during their commitments. *See* ECF No. 22 ¶¶ 356–57, 390–92, 405–11, 420–21. The court therefore agrees with PIW that John Doe #1 and John Doe #2 do not plausibly allege that they were unlawfully detained and do not state a claim for false imprisonment. *See* ECF No. 32-1 at 24; ECF No. 36 at 16–17; *Magwood*, 672 A.2d at 1088 (concluding there was no false imprisonment when a defendant "believed that [the

plaintiff] was mentally ill and likely to injure herself if not immediately detained, and his belief was reasonable”).

**I. The Plaintiffs Plausibly Allege A Claim For Intentional Infliction Of Emotional Distress**

The plaintiffs assert a claim for intentional infliction of emotional distress (“IIED”) based on the defendants’ conduct in permitting PIW to become and remain understaffed and failing to provide a safe, sanitary, humane, and healing environment; withholding treatment and therapy from PIW patients; and falsifying patient records and prolonging commitments. ECF No. 22 ¶¶ 539–49.

To establish a prima facie case of IIED, “a plaintiff must show (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.” *Williams v. District of Columbia*, 9 A.3d 484, 493–94 (D.C. 2010). To survive a motion to dismiss, the complaint must allege conduct that was “so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.” *Id.* at 494 (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)). Generally, “mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities” that are simply “inconsiderate or unkind” are not sufficiently outrageous to support a claim. *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993) (quoting Restatement (Second) of Torts § 46 cmt. d (Am. L. Inst. 1965)). In determining whether conduct is extreme and outrageous, the court “must consider: (1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place.” *Id.* PIW argues that Jane Doe #1, John Doe #1, and John Doe #2 fail to state a claim for IIED because they have not alleged sufficiently “outrageous” conduct. ECF No. 32-1

at 25–27. The defendants do not challenge the sufficiency of the complaint as to Golden and Jane Doe #2.

The complaint alleges that the defendants' staffing was "woefully insufficient to provide proper supervision" and "rendered patients vulnerable to injury and attack or the fear of injury or attack" as well as "self-injury." ECF No. 22 ¶ 542. Indeed, John Doe #1 felt unsafe and under threat of physical harm throughout his time at PIW. *Id.* ¶ 365. His roommate assaulted and threatened to kill another patient and threw a phone onto the floor, which shattered into sharp shards that could be used as weapons, which John Doe #1 considered harming himself with. *Id.* ¶¶ 366–67; *see also id.* ¶¶ 368–71. And John Doe #2 similarly felt physically in danger during the entirety of his involuntary commitment. *Id.* ¶¶ 399, 404. While John Doe #2's intake was being conducted, another patient punched him in the face. *Id.* ¶ 394. In addition, the complaint alleges the defendants intentionally falsified Jane Doe #1's records to justify prolonged commitment. *Id.* ¶¶ 256–61, 267–73, 284–89; *see Sherrod v. McHugh*, 334 F. Supp. 3d 219, 266 (D.D.C. 2018) (concluding that the defendant's filing of and failure to retract a false police report leading to an arrest "is sufficiently outrageous to support an intentional infliction of emotional distress claim"). Jane Doe #1, John Doe #1, and John Doe #2 also experienced unhealthy and unsanitary conditions, including foul smells, extremely cold temperatures, and small food portions. *Id.* ¶¶ 296–98, 372–74, 400–03. Based on these allegations, the court concludes that Jane Doe #1, John Doe #1, and John Doe #2 have stated a claim for intentional infliction of emotional distress.

### J. The Plaintiffs Plausibly Allege A Claim For Negligence Per Se

The plaintiffs assert a claim for negligence per se premised on alleged violations of two statutes: (1) the D.C. Mental Health Consumers' Rights Protection Act, D.C. Code § 7-1231.01, *et seq.*, and (2) the D.C. Civil Commitment Law, D.C. Code § 21-521, *et seq. See* ECF No. 22 ¶¶ 550–67. The defendants argue that the plaintiffs fail to state a claim for negligence per se

because the statutes they rely on do not provide a private cause of action. *See* ECF No. 30-1 at 31–32; ECF No. 32-1 at 27–28.

To prevail on a negligence per se claim, a plaintiff must demonstrate: (1) the statute that was violated "is meant to promote safety"; (2) the plaintiff is "a member of the class to be protected by the statute"; and (3) "the defendant is a person upon whom the statute imposes specific duties." *Ginsberg v. Granados*, 963 A.2d 1134, 1140 (D.C. 2009). In addition, the statute must contain "specific guidelines to govern behavior" and "not merely repeat the common law duty of reasonable care." *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 579 (D.C. 1996).

Although the defendants argue the statutes the plaintiffs rely on do not provide a private cause of action, the D.C. Court of Appeals has permitted plaintiffs to assert negligence per se claims even when the underlying statute does not contain a private right of action. *See Jarrett v. Woodward Bros.*, 751 A.2d 972, 977, 980 (D.C. 2000) (explaining that "incorporating into the common law a standard of care set by a legislative enactment is distinct from determining that a cause of action arises, by implication, under a statute" and that the court has "expressly rejected the view that where violation of a statutory safety standard is alleged, only an express or implied statutory cause of action will be recognized" (alteration omitted)).

The defendants argue in their reply briefs that the two statutes the plaintiffs rely on do not provide specific guidelines to govern behavior and establish a standard of care. *See* ECF No. 36 at 18–19; ECF No. 37 at 24–25. But the plaintiffs have pointed to numerous provisions of each statute that govern behavior. For example, the D.C. Mental Health Consumers' Rights Protection Act requires all providers to "treat consumers with consideration and respect for the consumer's dignity, autonomy, and privacy" and provides that those in inpatient programs shall have, among other things, the right to "[f]ree communication" with attorneys and family members, the

"[f]reedom to wear their own clothes," and "[r]easonable opportunities for regular physical exercise and freedom to go outdoors." D.C. Code § 7-1231.04(a), (e); *see* ECF No. 22 ¶¶ 523, 525. And the D.C. Civil Commitment Law states, for instance, that providers "shall not admit" persons presented for emergency observation and diagnosis when "the person is not mentally ill, not likely to injure himself or others unless immediately detained, or that hospitalization or detention in a facility certified for emergency observation and diagnosis is not the least restrictive form of treatment." D.C. Code § 21-522(c); *see* ECF No. 22 ¶ 556. The court is therefore unpersuaded by the defendants' arguments for dismissing the plaintiffs' claim for negligence per se.[5]

## III. Conclusion

For these reasons, the court grants in part and denies in part PIW's motion to dismiss, grants in part and denies in part UHSD's motion to dismiss, and grants UHSI's motion to dismiss. The plaintiffs' claims for disability discrimination under the ADA and DCHRA, source of income discrimination under the DCHRA, unfair and deceptive trade practices under the CPPA, false imprisonment, intentional infliction of emotional distress, negligence, and negligence per se will proceed against both PIW and UHSD; disability discrimination under the Rehabilitation Act will proceed against UHSD; and violation of the Fifth Amendment under 42 U.S.C. § 1983 will proceed against PIW.

---

[5] The defendants also assert that "the D.C. Mental Health Consumers' Rights Protection Act cannot support a negligence per se claim because it expressly provides that it does not create a private right of action." ECF No. 36 at 19; *see also* ECF No. 37 at 25. But the statute only says that "[r]ights and protections provided in this chapter shall not be construed to create new causes of action for monetary damages beyond those that currently exist in federal and local law." D.C. Code § 7-1231.15. Because negligence per se actions "currently exist in . . . local law," the defendants' argument does not provide a basis for dismissing the plaintiffs' claim.

AMIR H. ALI
United States District Judge

Date: September 11, 2026